**FAIRFAX HOSPITAL ASSOCIATION, INC., Appellant,**

v.

**Joseph A. CALIFANO, Jr., Secretary of Health, Education & Welfare, Appellee.**

**No. 77–1552.**

United States Court of Appeals, Fourth Circuit.

Argued April 4, 1978.

Decided Sept. 19, 1978.

William E. Donnelly, III, Fairfax, Va. (McCandlish, Lillard, Bauknight, Church & Best, Fairfax, Va., on brief), for appellant.

Eugene Tillman, Atty., Dept. of Health, Education & Welfare (William B. Cummings, U. S. Atty., and George P. Williams, Asst. U. S. Atty., Alexandria, Va., on brief), for appellee.

Robert A. Klein, Douglas B. Schwab, Weissburg & Aronson, Los Angeles, Cal., on brief, for amicus curiae Federation of American Hospitals.

Before HAYNSWORTH, Chief Judge, and RUSSELL and WIDENER, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

The plaintiff/appellant, a private provider of hospital services to the aged, has appealed from a decree of the District Court, granting summary judgment for the defendant/appellee, and sustaining a decision of the Commissioner of Social Security, under valid delegation from the Secretary of Health, Education and Welfare, denying reimbursement for certain costs claimed by the appellant in furnishing services under the "Medicare" program.[1] We affirm largely on the well-reasoned opinion of the District Court.[2]

The Medicare program for the aged and disabled, under which this controversy arises, is administered by a combination of private and governmental organizations or entities. Those who are eligible for benefits under the program are given treatment or care by a qualified "provider of services" such as the appellant hospital in this case.[3]

---

1. This program is officially denominated in the statute as Health Insurance for the Aged and Disabled, § 1395, *et seq.*, 42 U.S.C.

2. *Fairfax Hospital Ass'n, Inc. v. F. David Mathews, Secretary* (E.D.Va.1977), 459 F.Supp. 429.

3. A "provider of services" under the Act "means a hospital, skilled nursing facility, or home health agency, or, for purposes of section 1395(f)(g) and section 1395n(c) of this title, a fund." § 1395x(u), 42 U.S.C.

The provider is paid, not by the patient-beneficiary but out of the Federal Hospital Insurance Trust Fund.[4] In administering the program, the Government operates generally through what are called fiscal intermediaries.[5] These are private organizations functioning under contract with the Secretary of HEW, or his delegate.[6] They make interim estimated payments to the providers on a monthly basis, subject to subsequent adjustment for over-payment or under-payment.[7] At the end of the provider's fiscal year, the fiscal intermediary reviews the provider's cost report setting forth the latter's claims for reimbursement over the preceding fiscal year, audits the claims included therein if it deems this necessary and, as a result of that review, advises the provider if it makes a determination in connection with such review of either over-payment or under-payment to the provider during the year reviewed. This determination is formally set forth in a Notice of Program Reimbursement.[8] As a result of this determination, the fiscal intermediary may find certain payments not properly reimbursable in whole or in part and it may call for repayment by the provider for any interim over-payments found to have been made during the year. If the fiscal intermediary finds reimbursement of an item improper in this review, the provider may, should it be dissatisfied with the finding, request a hearing before the Provider Reimbursement Review Board (PRRB), provided the amount of the claim exceeds $10,000.[9] The decision of the Board, entered after a hearing, is final unless the Secretary "on his own motion" reverses or modifies it.[10] From the decision of the Board, if it is not reversed or modified by the Secretary, or from the ruling of the Secretary, if he has reversed or modified the Board's decision, there is a right of judicial appeal on the part of the provider to the District Court.[11]

The appellant hospital is a provider under the program. As a result of a review by the fiscal intermediary servicing the appellant's reimbursements for the fiscal year 1973, charges for pharmacy supplies furnished the provider by Virginia Medical Supply, Inc. for the first eight months of 1973 were disallowed to such extent as those charges exceeded costs of the supplies to Virginia Medical Supply, Inc. Similarly, the management fees paid in connection with the operation of the pharmacy supply house for the last four months of 1973 to Gunther K. Kessler and Associates, Inc. were reduced to the actual amount required to operate the pharmacy, plus reasonable compensation. The net reductions thus made in reimbursements to the appellant aggregated approximately $17,500. The basis of such disallowances was a regulation of the Secretary which fixed the amount of reimbursable costs for supplies furnished the provider when the provider and supplier are related by either "common ownership" or "common control." The statutory au-

---

4. 1395g, 42 U.S.C.

5. 1395h(a), 42 U.S.C. This section provides: "If any group or association of providers of services wishes to have payments under this part to such providers made through a national, State, or other public or private agency or organization and nominates such agency or organization for this purpose, the Secretary is authorized to enter into an agreement with such agency or organization providing for the determination by such agency or organization (subject to the provisions of section 1395oo of this title and to such review by the Secretary as may be provided for by the agreement) of the amount of the payments required pursuant to this part to be made to such providers, and for the making of such payments by such agency or organization to such providers."

6. The Secretary of HEW at the time of the challenged decision had delegated his functions under the Act to the Commissioner of Social Security. 33 F.R. 5836 (1968). For the validity of such delegation, see *Pacific Coast Medical Enterprises v. Califano* (C.D.Cal.1977), 440 F.Supp. 296, 305.

7. §§ 1395g and 1395x(v)(1)(A)(ii); 20 C.F.R. §§ 405.402(b)(1), (2) and 405.454.

8. 20 C.F.R. § 405.1803.

9. § 1395oo (a), 42 U.S.C.; 20 C.F.R. § 405.1835.

10. § 1395oo (f), 42 U.S.C.

11. *Ibid.*

thority for this regulation, as asserted by the Secretary is § 1395x(v)(1)(A), 42 U.S.C.:

"The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs * * *."

The fiscal intermediary determined that the Commonwealth Doctors Hospital, Inc.,[12] the provider, and the Virginia Medical Supply, Inc. and Gunther K. Kessler Associates, Inc. were under common control and that services furnished by the Virginia Medical Supply, Inc. and/or Gunther K. Kessler Associates, Inc. to the provider were reimbursable, not on the basis of charges made by the related supplier to the provider, but on the basis of the actual costs to the related supplier of the pharmacy supplies furnished the provider in the case of the Virginia Medical Supply, Inc. and on the basis of operating cost plus reasonable compensation in the case of the Associates. After a hearing, as requested by the provider, the PRRB filed its decision finding that the intermediary "did not produce compelling or conclusive evidence that the Pharmacy Owner did in fact exercise 'legal or effective control' over the Provider's actions or policies within the meaning of § 405.-427(b)(3) of the Regulations" and accordingly "conclude[d] that the Provider is entitled to the inclusion of the pharmacy and management charges." The Secretary, however, "on his own motion," reversed that decision of the PRRB and found that the parties were "related" within the terms of § 405.427, 20 C.F.R. From that ruling of the Secretary, the appellant has appealed.

The appellant's first claim of error relates to the validity and legitimacy of the Regulation dealing with the reimbursement for charges between "related" parties under the Medicare program. This Regulation defines "related to the provider" as meaning "that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies."[13] Control, as used in the Regulation, is defined in turn as existing "where an individual or organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution."[14] But the Regulation refines further its definition of "related" control by excepting from its operation any purchases by the provider from "related" supplier if the provider "demonstrates by convincing evidence * * * [a] that the supplying organization is a bona fide separate organization; [b] that a substantial part of its business activity of the type carried on with the provider is transacted with others than the provider * * and there is an open, competitive market for the type of services, facilities, or supplies * * *; [c] that services, facilities, or supplies are those which commonly are obtained by institutions such as the provider from other organizations and are not a basic element of patient care ordinarily furnished directly to patients by such institutions; and [d] that the charge to the provider is in line with the charge for such services, facilities, or supplies in the open market * * *."[15] As applied the Regulation treats items supplied a provider by a "related supplier," as if "the items [were] obtained from itself" in the calculation of costs under the reimbursement provisions of the program.[16]

There can be no disputing the Secretary's statutory authority to define by regulation the method of computing "reasonable cost" for charges for which a provider such as the appellant seeks reimbursement under the

12. The appellant Fairfax Hospital Associates, Inc. is the successor in interest of Commonwealth Doctors Hospital, Inc.

13. 20 C.F.R. § 405.427(b)(1).

14. 20 C.F.R. § 405.427(b)(3).

15. 20 C.F.R. § 405.427(d).

16. 20 C.F.R. § 405.427(c)(2).

Medicare program, nor the power of Congress to clothe the Secretary with the power to exercise that authority.[17] Such authority is plainly set forth in the statute. Thus, the statute expressly delegated to the Secretary the right to issue regulations "establishing the method or methods to be used" in computing such "reasonable cost."[18] In exercising that right, the Secretary could unquestionably classify, as he has often done,[19] the charges as made by various types of suppliers and fix the "reasonable cost" allowable for suppliers whose charges were within a particular classification. So long as it is not "a patently arbitrary classification, utterly lacking in rational justification"[20] and based on a state of facts which could not "reasonably * * be conceived to justify it,"[21]—so long as "the goals sought are legitimate, and the classification adopted is rationally related to the achievement of those goals,"[22]—the classification will not be found constitutionally invalid.

█ In order to satisfy these requirements for constitutionality, the classification, it has been repeatedly said, need not be perfect or "made with mathematical nicety" nor will it be flawed constitutionally if " 'in practice it results in some inequality.' "[23] Particularly in a program as complex as the Medicare program, with its large numbers of providers and suppliers and with its wide range of suppliers and services, the Secretary, in his regulations may make, indeed he must make, " 'rough accommodations—illogical, it may be, and unscientific,' "[24] using generalized classifications governing the methods of calculating "reasonable cost" when it is obvious that individualized cost calculations are both not administratively practical and unduly expensive.[25] It has been said that the true test for ascertaining the validity of a classification fashioned to control excessive costs under the Medicare program is whether it can be said that the Secretary "could rationally have concluded both that a particular limitation or qualification would protect against [the potential abuse] and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule" protecting against such abuse. Such is the test as stated in *Weinberger v. Salfi, supra*, at 422 U.S. 777 and 785, 95 S.Ct. 2457, 2472. So judged, the Regulation under review here satisfies constitutional requirements.

17. *Randolph v. United States* (3-judge Ct.N.C. 1967), 274 F.Supp. 200, 204, *aff'd*, 389 U.S. 570, 88 S.Ct. 695, 19 L.Ed.2d 785 (1968).

18. § 1395x(v)(1)(A), 42 U.S.C.

19. *See, St. Louis Univ. v. Blue Cross Hosp. Serv.* (8th Cir. 1976), 537 F.2d 283, 286, *cert. denied*, 429 U.S. 977, 97 S.Ct. 484, 50 L.Ed.2d 584; *Whitecliff, Inc. v. United States* (1976), 210 Ct.Cl. 53, 536 F.2d 347, *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977); *Chelsea Community Hospital v. Michigan Blue Cross* (E.D.Mich.1977), 436 F.Supp. 1050.

20. *Flemming v. Nestor* (1960), 363 U.S. 603, at 611, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435, *reh. denied*, 364 U.S. 854, 81 S.Ct. 29, 5 L.Ed.2d 77.

21. *McGowan v. Maryland* (1961), 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393, cited and quoted in *Dandridge v. Williams* (1970), 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491.

22. *Richardson v. Belcher* (1971), 404 U.S. 78 at 84, 92 S.Ct. 254, 258, 30 L.Ed.2d 231, quoted with approval in *Weinberger v. Salfi* (1975),

422 U.S. 749, at 768–769, 95 S.Ct. 2457, 45 L.Ed.2d 522.

23. *Dandridge v. Williams, supra*, at 397 U.S. 485, 90 S.Ct. at 1161.

  *See, also, Knebel v. Hein* (1977), 429 U.S. 288 at 294, 97 S.Ct. 549 at 553, 50 L.Ed.2d 485:
  "The District Court was correct that the regulations operate somewhat unfairly in appellee's case. Nevertheless, we are satisfied that they are the product of a valid exercise of the Secretary's statutory authority. Perhaps it might have been more equitable to allow a deduction for all commuting expenses, or for the expenses of commuting to a training program, or—as the order of the District Court provides—just for such expenses covered by state transportation allowances. But the availability of alternatives does not render the Secretary's choice invalid."

24. *Dandridge v. Williams, supra*, at 397 U.S. 485, 90 S.Ct. at 1161.

25. *Weinberger v. Salfi, supra*, at 422 U.S. 773–780, 95 S.Ct. 2457.

The appellant concedes the first predicate for the challenged Regulation, which is "that there is a potential for abuse [in connection with charges under the Medicare program] between related suppliers and providers." If it be accepted that there is "a potential for abuse" in charges made between "related" supplier and provider it follows that the Secretary has authority to formulate regulations and to prescribe reasonable classifications to prevent such abuse. In the oft-quoted language of *Williamson v. Lee Optical Co.* (1955), 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 "[i]t is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure [or administrative regulation] was a rational way to correct it." And that is just what the challenged Regulation purports to do, *i. e.*, to prevent a clearly perceived possible abuse through non-competitive, exclusive purchase and sale arrangements between a provider and supplier either of which has "the power, directly or indirectly, significantly to influence or direct the actions" of the other. In considering the Regulation as a reasonable effort to achieve this purpose, it is also important to note the restraint with which it is phrased in order to avoid the possibility of unfairness in its application. The Regulation did not cover charges by any and all suppliers, which had significant power to influence, or were subject to significant power to influence transactions between provider and supplier. It restricted its application to charges by that specific related supplier, who carried on no substantial business of the type carried on with the provider with any other organization and which was furnishing the provider supplies that a provider normally and customarily purchased directly and not from an intermediate supplier. Charges for supplies furnished by such a "related supplier," under the Regulation, would not be reimbursable at a price greater than would have been the costs of such supplies had the hospital-pro-

vider followed the customary practice of hospital-providers and purchased such supplies direct.

What in essence the Regulation did was to declare that, in computing the "reasonable cost" to a "related" hospital-provider for pharmaceutical supplies as in this case, the Secretary would reimburse that hospital-provider for those supplies at the price which normally hospitals similar to the "related" hospital-provider seeking reimbursement paid and not, for instance, at a price charged by the typical regular retail pharmacy serving a large number of customers purchasing individually. Stated somewhat differently, the Regulation was intended to prevent hospital-providers from departing from the customary method of purchasing direct pharmaceutical supplies and from inflating unfairly the charge to the Government for pharmaceutical supplies furnished its Medicare patients by what could be regarded as manipulated purchases of such supplies at a retail price from a "captive" pharmacy operated merely to serve as a supplier to the hospital selling under an exclusive, long-term non-competitive lease, and subject to the control test under the Regulation. We find nothing irrational or violative either of Due Process or Equal Protection in such Regulation, hedged about as it is by a reasonable exception.[26]

The suggestion of the appellant that the Secretary exceeded his authority to prescribe by regulation "the method or methods to be used" in computing reasonable cost by providing for the sanctioning and control of "reasonable cost" on the basis of the relationship of the buyer and seller is supported by no logic or reason. It is little more than an argument—at least in this case—that the Government is absolutely obligated to reimburse a provider-hospital for purchases made by it from a "related" supplier even if the price for such purchases is substantially above what the provider, if it had followed the normal practice of a hospi-

**26.** To the same effect, *see, Schroeder Nursing Care, Inc. v. Mutual of Omaha Ins. Co.* (E.D. Wis.1970), 311 F.Supp. 405, 411 ("The distinction which the regulation draws between the situations of related and non-related organizations has a rational basis.") *Chelsea Community Hospital v. Michigan Blue Cross, supra*, at 1056, n. 2 (436 F.Supp.).

tal-provider and bought directly, would have had to pay. The argument falsely assumes that the power to prescribe "reasonable cost" does not carry with it the power to determine what are not "reasonable costs." Following this reasoning, the appellant would contend that, even though the well established market price for an article under normal purchasing practices was one price but the provider chose to buy the same article from a favored supplier under an unusual arrangement at a much higher price, the Government may not, in assessing "reasonable cost," deny reimbursement at the unnecessarily higher price. The argument is completely without merit. Under this reasoning, the Government would be compelled to "reimburse the provider for all costs, no matter how extreme." [27]

Nor are we persuaded that the Regulation creates an unconstitutional irrebuttable presumption. The doctrine of impermissible irrebuttable or conclusive presumption has been justly criticized as of doubtful constitutional antecedents and of limited application.[28] It has been aptly observed that if the doctrine were strictly applied, it would "severely restrict the ability of legislatures to draft statutes that [can] be effectively administered," [29] and would operate as "a virtual engine of destruction for countless legislative judgments which have heretofore been thought wholly consistent with the Fifth and Fourteenth Amendments to the Constitution." [30] Its consistent application could, as Chief Justice Burg-

er observes in his dissent in *Vlandis v. Kline* (1973), 412 U.S. 441 at 462, 93 S.Ct. 2230, 2241, 37 L.Ed.2d 63, invalidate a state statute providing that one "may not be licensed to practice medicine or law unless he or she is a graduate of an accredited professional graduate school," it would, as one commentator has suggested, invalidate section 16(b) of the Securities Exchange Act and even a state statutory speed limit.[31] For this reason, it has been suggested that courts should "abandon [their] 'war on irrebuttable presumptions' as theoretically unsound and practically unworkable." [32]

Nor has the doctrine been given more than a limited application by courts. The commentator in 72 *Michigan Law Review*, after reviewing all the cases in which the doctrine was stated, found that "[t]he conclusive presumption doctrine has been applied exclusively in cases that involved overinclusive burdening classifications," and he concludes that, "[i]f the doctrine is to be manageable any future use must be limited to its past role as a hardship exception to established equal protection precedent." [33] In *Weinberger v. Salfi*,[34] the Court after reviewing the authorities in which the doctrine had been cited, found that all cases, where the doctrine had been referred to, could be classified under two groups: Either as cases in which the challenged regulation or statute was not rationally related to the object of the regulation or statute (a typical ground for invalidating a classification) [35] or as a case involving a fundamental

27. *See, Pleasantview Convalescent, Etc. v. Weinberger* (7th Cir. 1976), 565 F.2d 99, 103.

28. The author of Note, *The Conclusive Presumption Doctrine: Equal Process or Due Protection?* 72 *Mich.L.Rev.* 800, 827 (1974) states:
    "Perhaps the most serious defect in the conclusive presumption doctrine is that it rests upon a disingenuous, misleading analysis."

29. *Ibid.* at 834.

30. *Salfi, supra,* at 422 U.S. 772, 95 S.Ct. at 2470.

31. Note, *ibid.,* 72 *Mich.L.Rev.* at 832–3.

32. Note, *ibid.,* 72 *Mich.L.Rev.* at 834.

33. Note, *ibid.,* 72 *Mich.L.Rev.* at 829, 830.

34. 422 U.S. at 772–773, 95 S.Ct. 2457.

35. *U. S. Dept. of Agriculture v. Murry* (1973), 413 U.S. 508, 514, 93 S.Ct. 2832, 2835, 37 L.Ed.2d 767 (classification irrational for making "the issue * * * not the indigency of the child but the indigency of a different household"); *Jimenez v. Weinberger* (1974), 417 U.S. 628, 630, 94 S.Ct. 2496, 2498, 41 L.Ed.2d 363 (the issue of the case, as stated by the court was whether "the statute's classification is rationally related to the legitimate governmental interest of avoiding spurious claims.").
    *Vlandis v. Kline, supra,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63, is not included in this list in *Salfi* but in *Sosna v. Iowa* (1975), 419 U.S.

constitutional right (a classification which corresponded to the extreme hardship case noted in the comment *supra*).[36] It then proceeded to dismiss the irrebuttable or conclusive presumption doctrine as entirely inapposite in reviewing for constitutionality statutes or regulations involved in "social welfare legislation" and to reaffirm the rule in that area as declared in *Richardson v. Belcher, supra,* 404 U.S. 788, 92 S.Ct. 254, 30 L.Ed.2d 231; *Dandridge v. Williams, supra,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 and *Flemming v. Nestor, supra,* 363 U.S. 604, 80 S.Ct. 1367, to wit: So long as a claimant for benefits or payments under a social welfare program is "free to present evidence" that he is not disqualified under the test established by the statute or regulation, his "only constitutional claim is that the test [he] cannot meet is not so rationally related to a legitimate legislative objective that it can be used to deprive [him] of benefits available to those who do satisfy that test."[37]

The rule thus declared in *Salfi* has been recently reaffirmed in *Knebel v. Hein,*[38] which involved a regulation of the Secretary of Agriculture issued under the Food Stamp program. That regulation, in fixing the amount an eligible householder had to pay for food stamps by the householder's income, defined income to include transportation allowances received in attendance at a training school. The allowance in the particular case was conceded to be less than the actual cost of transportation. As a result of the inclusion, the householder had his price for food stamps increased. The householder contended the regulation re-

sulted in a conclusive presumption that the transportation allowance was income, a presumption which in the particular case was not true in fact. After observing that the challenged regulation "operate[d] somewhat unfairly in appellee's case," the Court sustained the regulation, saying (p. 297, 97 S.Ct. at 555):

"Nor do the regulations embody any conclusive presumption. They merely represent two reasonable judgments: First, that recipients of state travel allowances should be treated like other trainees and like wage earners; and second, that the standard 10% deduction, coupled with the 30% ceiling on coupon purchase prices, provides an acceptable mechanism for dealing with ordinary expenses such as commuting. The Constitution requires no more. See *Salfi, supra,* 422 U.S. at 771, 777, 95 S.Ct. 2457."

And the rule as stated in *Salfi* and *Knebel* was applied in connection with this very Regulation in *Chelsea Community Hospital v. Michigan Blue Cross, supra.*[39] There the Court confronted a challenge to the Regulation under the irrebuttable presumption doctrine. After reviewing the authorities, it concluded that the doctrine had been either "ignored or distinguished on questionable grounds" in recent cases and had been specifically dismissed as a ground for invalidating a regulation such as § 405.427, 20 C.F.R., issued as that regulation was in the social service area. In so doing it followed the earlier decision in *Schroeder Nursing Care, Inc. v. Mutual of Omaha Ins.*

---

393, at 409, 95 S.Ct. 553, 42 L.Ed.2d 532, *Vlandis* is also catalogued as a case in which the Court found the statute irrational. That is obvious as *Sosna* points out, because the Court said it was not finding unconstitutional "a *reasonable* durational residency requirement," from which the inescapable deduction is that the challenged statute established an unreasonable irrational residency requirement; (Italics added) *see, also, Usery v. Turner Elkhorn Mining Co.* (1976), 428 U.S. 1 at 22, 96 S.Ct. 2882, 49 L.Ed.2d 752; *Lavine v. Milne* (1976), 424 U.S. 577 at 584–5, n. 9, 96 S.Ct. 1010, 47 L.Ed.2d 249.

**36.** *Stanley v. Illinois* (1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (an "essential" right "far more precious * * * than property rights"); *Cleveland Board of Education v. LaFleur* (1974), 414 U.S. 632, 639–640, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (right involved "one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.").

**37.** *Weinberger v. Salfi, supra,* at 422 U.S. 772, 95 S.Ct. at 2470.

**38.** 429 U.S. 288, 97 S.Ct. 549, 50 L.Ed.2d 485.

**39.** 436 F.Supp. 1050, 1062.

*Co., supra.*[40]  We are in agreement with those decisions.

The appellant here does not deny that it was free to present evidence that it was not disqualified under the Regulation it attacks. In fact, it did offer such evidence.  Under *Salfi*, its only constitutional claim under those circumstances could be that the regulation was not rationally related to the legitimate objective of preventing abuse in charges between "related" providers and suppliers.  For the reasons already given, that it cannot do in this case, and its challenge to the Regulation must fail.

The appellant next directs its attack at the Secretary's power of review, and in this it is joined by the *amicus*, Federation of American Hospitals.  Its contention in this regard is based on a construction of the statute creating the Provider Reimbursement Review Board, § 1395*oo*, 42 U.S.C. This Board was created in 1972, with its members appointed by the Secretary for fixed terms, for the purpose of providing a form of appeal "by a provider of services of a fiscal intermediary's final reasonable cost determination." [41]  Decisions of the Board were to be "supported by substantial evidence when the record is viewed as a whole." [42]  As originally created, the decision of the Board was to be final unless the Secretary on his own motion reversed or modified the Board's decision adversely to the provider.  This provision is substantially modeled on the following language in § 557(b), 5 U.S.C., which provides:

> " * * * When the presiding employee makes an initial decision, that decision then becomes the decision of the agency without further proceedings unless there is an appeal to, *or review on motion of*, the agency within time provided by rule." (Italics added)

This provision of the Administrative Procedure Act, even if the 1972 amendment had not so provided, would have made the decision of the Board the final decision or the "decision of the [Secretary]" "unless there is * * * review on motion of" the Secretary, but, if "on his own motion" the Secretary reviews and reverses that decision of the Board, the appropriate decision for review judicially would of course have been that of the Secretary and the scope of review would have been governed by the clearly erroneous rule.  The provider itself, however, had no right under the 1972 amendment to judicial review of the Board's decision *unless* the Secretary "on his own motion" had reversed or modified the Board's decision.  In the event, but only in the event, the Secretary did reverse or modify the Board's decision, might there be judicial review of the Secretary's decision.

In 1974 Congress amended subsection (f) of § 1395*oo* by granting to the provider "the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification" of the Board's decision by the Secretary.[43]  This amendment was intended, as the Congressional history reveals, to "permit judicial review of the Board's unmodified findings as well" as of the Secretary's reversals or modifications of the Board's decision.[44]

It is the appellant's position, supported by the *amicus*, that, as a consequence of the unique composition and power of the Board, its decision, certainly as to any factual findings, could only be reviewed by the Secretary for want of substantial evidence to support its decision.  It does not contend that the 1972 amendment or the 1974 amendment explicitly so narrows the Secretary's scope of review as to deny to him the usual power of review exercisable by the agency head in administrative proceedings. It concedes that the amendments are silent

**40.**  311 F.Supp. 405.

**41.**  U.S.Code Cong. & Admin.News, 92nd Cong. 2d Sess. (1972), p. 5094.

**42.**  1395*oo* (d), 42 U.S.C.

**43.**  § 1395*oo* (f)(1).

These provisions of both the 1972 and 1974 statutes are explained in U.S.Code Cong. & Admin.News, 92nd Cong., 2d Sess. (1972) at pp. 5094–5095 and p. 5388 and in the same service 93rd Cong., 2d Sess. (1974) at pp. 5994–5996.

**44.**  See note 43.

on any specific intention to so limit the Secretary's scope of review. But it argues that this limitation is implicit in the language of the amendments fixing the Board's own method of decision. Thus, it says that the statements in the statute that the Board's decisions "shall be supported by substantial ˙evidence when the record is viewed as a whole"[45] carries with it the necessary implication that, in reviewing the Board's factual findings, the Secretary's own scope of review is limited to a determination of whether the Board's decision is "supported by substantial evidence when the record is viewed as a whole." Based on the assumption that this is the correct construction of the 1972 and 1974 amendments, the appellant asserts that the decision of the Board in this case, which turned, in its view, solely on the resolution of a factual issue, was supported by substantial evidence in the record and that the Secretary was accordingly precluded from reversing such decision.

It would seem that, even under the appellant's construction of the amendments, the Secretary would be entitled to reverse the decision of the Board if the latter's decision evidenced an egregious error in connection with a critical fact in the case on which it could be said the factual issue may well have been resolved or if, in its review of the evidence, the Board applied an improper legal standard. The decision of the Board in this case is open to fault on both grounds. The Board's decision was in error in its finding on a critical factual issue in the case. The lease granted the pharmacy-supplier by the hospital-provider was an important fact—in fact, it might have well been the decisive fact, so far as the Board was concerned—in the case. It was the intermediary's position that the lease was privately negotiated between the two parties without considering any competitive bids for such a lease from any other pharmacy.

This fact was regarded as a critical point by the intermediary because it lent strong support to the intermediary's theory that the lease was a "sweetheart" contract. The Board, however, categorically found that "the aforesaid pharmacy lease was [not a noncompetitive contract but] one of three proposals submitted for approval to the Provider's 'contract committee'." The Secretary submits in his brief that this finding is clearly erroneous. The appellant does not contradict this assertion of the Government in its reply brief. We can, therefore, safely assume both on the basis of our own review of the record and on the undisputed statement of the Government that this finding of the Board on a critical factual issue was clearly erroneous.

■ Even more important is the Board's error in its own standard of review and in its ruling on burden of proof. The Board assumed that the intermediary had the burden of proving that the provider's claim for reimbursement was not allowable under the Regulation rather than that the provider had the burden of establishing that its claim for reimbursement was allowable under the applicable regulations. But not only did it thus improperly place the burden of proof on the intermediary[46] but also it held that, in order to sustain such burden, the intermediary had to prove relatedness under the Regulation by "compelling or conclusive evidence." Thus, in finding for the appellant-provider, the Board based its decision on a finding that the intermediary had not presented "compelling or conclusive evidence * * * that the Provider [was] related" to the pharmacy-supplier. If this standard for evaluating the evidence is erroneous as a matter of law, the error would clearly vitiate the Board's decision and the Secretary would have plain authority, even under the appellant's own construction of the amendments, to reverse the Board.[47] There is no˙reason to assume in administra-

**45.** § 1395oo (d), 42 U.S.C.

**46.** *See* Davis, *Administrative Law of the Seventies*, § 14.14 at pp. 345–6 (1976); *Stearns Elec. Paste Co. v. Environmental Protection Ag'cy* (7th Cir. 1972), 461 F.2d 293, 305, notes 38 and 39; *Woodland Nursing Home Corp. v. Weinberger* (S.D.N.Y.1976), 411 F.Supp. 501, 505.

**47.** Davis, *Administrative Law of the Seventies*, § 16.01, p. 397 (1976).

tive proceedings that the proponent of any fact must establish that fact by "conclusive" evidence rather than by the preponderance of evidence any more than the litigant is so required in any other type of proceeding. There are some unique types of cases, such as actions in fraud, where the courts have adopted the rule that the proof must be "compelling" but this proceeding does not fall within such rule. The Board obviously followed an incorrect standard of proof.

■ It must not be assumed from what has been said that we agree with the appellant's assumption with respect to the Secretary's scope of review. While the provisions of § 1395oo, as amended, may not conform to the normal phraseology pattern in providing for administrative review,[48] we do not find that the mere fact that in this statute the Board, which is to hear the controversy initially, and is directed to make its decision on "substantial evidence," has placed a halter on the Secretary's usual scope of administrative review, in the absence of any suggestion in the legislative history, or in the express language of the amendments to support such a conclusion. The District Court aptly observed that in *Universal Camera Corp. v. Labor Bd.* (1951), 340 U.S. 474, 492, 71 S.Ct. 456, 467, 95 L.Ed. 456 the Court found such a limitation on an agency's power of review would be "so drastic a departure from prior administrative practice that explicitness [in such a limitation on the Secretary's scope of review] would be required." The appellant would dismiss the relevancy of this statement to this proceeding because it was made in connection with proceedings before another agency. However, this statement of the Court was not a statement based on some peculiar feature of review under the National Labor Act; it related to "administrative practice" as followed generally. It was thus of general application and we see no reason for finding it irrelevant in this connection. As in *Universal Camera*, so here it would be "a drastic departure from prior administrative practice" to circum-

scribe the Secretary's scope of review as narrowly as appellant would have us do. In the absence of an explicit contrary statement in the amendments, we conclude that the Secretary's right of review was not limited to a review merely for substantial evidence.

■ It is argued, however, that the Secretary has himself found that his scope of review is restricted to determining whether the decision of the Board is supported by substantial evidence and cites as evidence the Secretary's decision in *Dec. of Social Security Commn'r* (July 13, 1976, CCH Medicare and Medicaid Guide ¶ 27,-909). We do not find in that decision any reference to the scope of the Secretary's review of the Board's decisions. The Commissioner merely said that: "[T]he record supports the Board's decision and no prejudicial error has been found." That sentence is manifestly not a holding by the Secretary that his scope of review is as urged by the appellant. We find no more persuasive the suggestion as advanced by the *amicus* that because, in a proposed bill, now pending in Congress, final decisionmaking authority is granted the Board in making certain determinations in proceedings authorized in that bill, it must be assumed that Congress intended, when it enacted the 1972 and 1974 amendments, dealing as those amendments did with entirely different determinations by the Board, the same scope of review was to apply as was provided in the new bill for other determinations in other types of proceedings made by the Board, after the Board had been enlarged for the purpose of making such new determinations. We find no basis in either of these suggestions for restricting the Secretary's scope of review to review for substantial evidence.

■ Finally, the appellant urges that the decision of the Secretary, even if reviewable under the clear error rule, was clearly erroneous. The District Court carefully reviewed the Secretary's decision and concluded it was not clearly erroneous and was supported by substantial evidence in the

---

**48.** *Cf., however*, § 557(b), 5 U.S.C., discussed *supra*.

record. We find no error in this ruling of the District Court.

The decision of the District Court is accordingly

AFFIRMED.