# UNITED STATES COURT OF APPEALS
## FIFTH CIRCUIT

———————

No. 00-51138

———————

SID PETERSON MEMORIAL HOSPITAL,

Plaintiff - Appellant,

versus

TOMMY THOMPSON, Official Capacity as SECRETARY OF HEALTH AND HUMAN SERVICES,

Defendant - Appellee.

Appeal from the United States District Court
For the Western District of Texas

December 12, 2001

Before KING, Chief Judge, and JOLLY and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Sid Peterson Memorial Hospital (SPMH) appeals the district court's grant of summary judgment in favor of Tommy Thompson, acting in his official capacity as the Secretary of Health and Human Services (the "Secretary"). SPMH filed this case is federal court pursuant to Title XVIII of the Social Security Act, 42 U.S.C. § 1395oo(f)(1), challenging the Secretary's decision denying the hospital's claim for reimbursement of interest expenses on certain capital indebtedness attributable

to the purchase of its hospital facility on various grounds. The district court ruled that the interest

expenses incurred by SPMH were not "proper," and therefore not reimbursable, because the hospital

borrowed the underlying capital from the Hal and Charlie Peterson Foundation (the "Foundation"),

a related-party as defined by the Medicare Regulations. We hold that the §§ 413.153 and 413.17 of

the Medicare Regulations, defining related-parties and control, are consistent with the text of the

Medicare statute. We also hold that the Secretary's interpretation of these regulations was reasonable

and that substantial evidence supported his determination that the loan from the Foundation to SPMH

for the purchase of the hospital facilities was a related-party transaction. In addition, we conclude

that there is no equitable exception to the denial of reimbursement under the Medicare regulations.

**I**

**A**

The Medicare program is codified in Title XVIII of the Social Security Act, 42 U.S.C. § 1395

et seq., which establishes a federally funded health insurance program for the elderly and disabled.

"Part A" of the Medicare regime authorizes direct payment for covered hospital services to providers

of health services. *See* 42 U.S.C. §§ 1395c-1395i-4. In essence, a provider of services does not bill

eligible patients under Medicare for covered services. Rather, the provider is reimbursed by the

government,[1] for the lesser of its reasonable costs in providing approved services or the customary

charges for those services. *See* 42 U.S.C. § 1395f(b).

The Medicare reimbursement program is structured around this concept of reasonable costs.

The statute defines "reasonable cost" as "the cost actually incurred [by the provider] excluding

---

[1] A provider may be reimbursed for services rendered to Medicare beneficiaries either directly from the Secretary or through a fiscal intermediary. The intermediary acts as the Secretary's agent for purposes of auditing claims and administering payments. *See* 42 C.F.R. § 421.100.

-2-

therefrom any part of the incurred cost found to be unnecessary in the efficient delivery of needed health services." 42. U.S.C. § 1395x(v)(1)(A). Based on these broad parameters, the statute directs the Secretary to create regulations in order to establish "the method or methods to be used, and items to be included, in determining such costs." *Id.* These regulations must take into account the direct and indirect costs necessary in the efficient delivery of covered services to Medicare beneficiaries so that such costs will not be borne by non-covered individuals. *See* 42 U.S.C. § 1395x(v)(1)(A)(i).

Pursuant to its statutory authority, the Secretary has promulgated regulations, codified at 42 C.F.R. part 413, governing the reimbursement of health care providers for reasonable costs. In addition, the Secretary has published interpretations of the governing statute and regulations in the Provider Reimbursement Manual (PRM) in order to assist these pro viders as well as the fiscal intermediaries in understanding how the government applies this regulatory framework.

The Medicare regulations recognize that necessary and proper interest on both current and capital indebtedness is generally an allowable cost. *See* 42 C.F.R. § 413.153. In order for a provider to receive reimbursement, however, the interest on the loan must be "proper." The regulation defines "proper" interest as interest that is both: (1) "incurred at a rate not in excess of what a prudent borrower would have had to pay in the money market existing at the time the loan was made"; and (2) "paid to a lender not related through control or ownership, or personal relationship to the borrowing organization." 42 C.F.R. § 413.153(a)(3)(i)-(ii). A provider is related to another organization if "the provider to a significant extent is associated or affiliated with or has control of or is controlled" by another organization. 42 C.F.R. § 413.17(b)(1). Control exists "if an individual or an organization had the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution." 42 C.F.R. § 413.17(b)(3). The PRM states that in

making a determination that the provider and lender are related through control, the Secretary will examine "the entire body of facts and circumstances involved" in each case. PRM § 1004.3.

The purpose behind the related-party rule is to assure that loans are legitimate and necessary, and that the interest rate is reasonable. *See* 42 C.F.R. § 413.153(c)(1). The rule is "prophylactic" in the sense that it involves a judgment that the probability of abuse in related transactions is high enough that it is more efficient to prevent the opportunity for abuse from arising by prohibiting certain provider / lender relationships that are likely to give rise to self-dealing transactions, rather than to try to detect actual incidents of abuse. *See Biloxi Reg'l. Med. Ctr. v. Bowen*, 835 F.2d 345, 350 (D.C. Cir. 1987). The regulations provide that the presence of control by either the provider or the lender "could affect the 'bargaining' process that usually accompanies the making of a loan, and could thus be suggestive of an agreement on higher rates of interest or of unnecessary loans." 42 C.F.R. § 413.153(c)(1). Thus, the rule precludes the recovery of capital interest expenses if the lender can significantly influence, directly or indirectly, the actions of the provider.

**B**

The Foundation was organized in 1944 for the purpose of supporting charitable and educational undertakings. In pursuit of these goals, the Foundation constructed a 116-bed, nonprofit hospital in Kerrville, Texas in 1949. The Foundation continued to own and manage the hospital until January 1, 1990, when it sold the facility to SPMH.

The Foundation, developing concerns that large malpractice awards could adversely affect its other assets, recognizing that the broader charitable mission of the Foundation and that of the hospital did not always coincide, and confronting a growing desire by the medical staff of the facility to have a greater voice in the daily operations of the hospital, decided to sell the facility. Due to

limitations set forth in its charter and by-laws, the Foundation concluded that only charitable, non-profit organizations would be considered as potential buyers. In addition, the Foundation decided that, in order to ensure that the hospital would continue to serve the community, it should be sold to a local entity.

Faced with these limitations on potential buyers, the Foundation sought to create a new local entity to which it could spin-off the hospital. To this end, Chas H. Johnson, a member of the Foundation's Board, John M. Mosty, a Foundation employee, and John Burkett, Jr., an attorney, incorporated SPMH for the exclusive purpose of operating a charitable hospital in Kerr County, Texas. SPMH's charter provided for a nine-member Board of Directors. Of these nine, three members, Scott F. Sterling, W.C. Matthews, and Judge Julius R. Neunhoffer, were also members of the Foundation's Board of Trustees. The other six directors were active and retired physicians and members of the local community. In addition, F.W. Hall, Jr., a member of the Foundation's Board of Trustees, also served as an advisory member of the nascent corporation's Board. During its first organizational meeting, the Board elected officers, approved filing for tax-exempt status with the IRS, and selected a bank. The IRS subsequently recognized SPMH as a 501(c)(3) tax-exempt corporation.

While members of the Foundation's Board were incorporating SPMH, the Foundation continued planning the sale of hospital. The Foundation sought advice from the IRS as to the potential adverse tax consequences arising from the proposed sale. On December 14, 1989, the IRS informed the Foundation that the sale of the hospital to SPMH would not affect its tax-exempt status. Eight days later, the Foundation held a special meeting, during which the Board of Trustees accepted the resignations of Sterling, Matthews, Neunhoffer, and Hall. Then, on December 29, 1989, the

Foundation and SPMH entered into an agreement whereby all properties used in the operation of the hospital would be transferred to the plaintiff.

The agreement became effective at midnight on December 31, 1989. It provided for no gain or loss on the asset sale because the sale price was set at the book value of the hospital's assets. SPMH purchased the tangible assets of the hospital for the total price of $20,750,311.84. The Foundation fully financed the purchase by issuing two promissory notes to SPMH. The first note for $17,632,328.84, covered the hospital's tangible assets and was payable to the Foundation over a thirty-two year period at 6% interest per annum. The second note for $3,117,983, covering the hospital's intangible assets and existing inventories, was payable at the end of one year. The interest rate on the second note was also 6%. At the conclusion of the transaction, SPMH wholly owned and operated the hospital facilities.

In its 1990, 1991, and 1992 cost reports to Medicare, SPMH claimed the interest expenses paid on the notes to the Foundation as a reimbursable expense. When SPMH's fiscal intermediary, Blue Cross and Blue Shield of Texas (the "Intermediary"), audited these expense reports, it found that the Foundation and SPMH were related parties as set forth in § 218 of the Provider Reimbursement Manual because the Foundation had controlled and/or influenced the actions of the Board of Directors of SPMH. The Intermediary issued a Notice of Program Reimbursement disallowing the disputed interest costs. This disallowance of interest expenses reduced the amount of Medicare reimbursement by approximately $1,300,000 for the three years in contention.

Faced with the loss of these Medicare funds, SPMH appealed the Intermediary's decision to the Provider Reimbursement Review Board (PRRB). The PRRB concluded that SPMH and the Foundation were related parties as defined by 42 C.F.R. § 413.17. Accordingly, it concluded that

-6-

the interest expense was not an allowable cost under the regulatory provisions governing interest expenses in 42 C.F.R. § 413.153. Specifically, the PRRB found that the Foundation had control over SPMH and exercised that control to influence significantly SPMH's actions in the negotiation and sale of the hospital. The PRRB concluded that there was substantial evidence that the Foundation's Board of Trustees controlled the transaction's final outcome. Rejecting SPMH's argument that the only relevant events that the PRRB could consider were those occurring at the time of and subsequent to the sale, the PRRB determined that the spin-off was based on a preconceived plan that the Board initiated nearly two years prior to the December 28, 1989 closing date. The PRRB maintained that the Foundation's Board developed the notion to legally separate the hospital from the Foundation as part of an overall strategy to restructure its organization and also determined the manner in which to carry out the "spin-off"and executed the transaction almost exactly as planned. The Secretary subsequently adopted the PRRB's report, and SPMH appealed the Secretary's decision to the district court.

The district court upheld the Secretary's decision denying reimbursement. It concluded that the regulations were not inconsistent with the Medicare statute and that the Secretary could properly look at all of the facts and circumstances surrounding the transaction in determining whether the parties were related through control. In addition, the district court found that substantial evidence existed that the Foundation and SPMH were related. Lastly, the trial court held that there was no equitable exception to the related-party rule under the provisions of 42 C.F.R. §§ 413.17 and 413.153.

On appeal, SPMH renews its challenge to the validity of the regulations, themselves, as well as the Secretary's interpretation of them. SPMH also contests the Secretary's determination that

substantial evidence supported the finding that the Foundation was related to SPMH through control. SPMH further argues that the district court erred in not finding an equitable exception to the related-party rule when the interest on the underlying transaction was at fair market value.

**II**

SPMH first contends that the Secretary's interpretation of 42 C.F.R. §§ 413.17 and 413.153 renders the regulations invalid because they will result in cost-shifting to non-covered patients. If that were the case, the regulations would be inconsistent with the express language of 42 U.S.C. § 1395x(v)(1)(A).

We review an agency's interpretation of a statute through the promulgation of regulations under the familiar two-part test of *Chevron U.S.A., Inc. v. Natural Resources Defense Counsel, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, we must first determine whether Congress has directly spoken on the precise question at issue. *Chevron*, 467 U.S. at 842. If Congress has not addressed the issue, we must then determine whether the agency's interpretation of the statute was reasonable. *Id.* at 843. Our review under the second prong of the *Chevron* test is narrow. We are not empowered to overrule the Secretary's interpretation merely because it does not coincide with our own notion of "reasonable cost," or because we might have interpreted the statute in a different manner. *See Batterton v. Francis*, 432 U.S. 416, 425 (1977). Instead, we will uphold the regulation if it bears a rational relationship to the purposes of the statute. *Mercy Hosp. v. Heckler*, 777 F.2d 1028, 1031 (5th Cir. 1985) (construing the Social Security Act).

As stated above, Congress has conferred upon the Secretary exceptionally broad authority to prescribe standards for defining reasonable costs. The statute expressly delegates to the Secretary the right to issue regulations "establishing the method or methods to be used" in computing

"reasonable cost." 42 U.S.C. § 1395x(v)(1)(A). [2] Because Congress chose to delegate the regulatory authority to the Secretary rather than addressing the reasonable cost concept itself, we will review the regulations merely to determine whether they are rationally related to the enabling legislation.

Under the statute, the Secretary is required to adopt regulations that result in the reimbursement of actual costs: "Although payment may be made on various bases, the objective, whatever method of computation is used, will be to approximate as closely as practicable the actual cost (both direct and indirect) of services rendered to the beneficiaries of the program . . . ." S. Rep. No. 404, 89th Cong. 1st Sess. at 36 (1965), *reprinted in* 1965 U.S.C.C.A.N. 1943, 1976. Here, the regulations provide a reasonable method of determining actual costs. The Secretary could have rationally concluded that individualized cost calculations were neither required by the statutory text nor administratively practicable and that a broader, transaction-based rule was appropriate. The denial of reimbursement of interest under the related-party rule is not patently arbitrary, utterly lacking in rational justification, but rather a logical attempt by the Secretary to focus on those transactions that pose a significant risk of improper inflation of costs to the Medicare program. In doing so, he respected the congressional directive that he establish the best gauge of actual costs.

Recognizing the necessity of some imprecision, those courts that have considered the validity of the related-party rule have generally upheld this prophylactic rule despite its potential for occasional overinclusiveness. *See*, *e.g.*, *Shaker Med. Ctr. Hosp. v. Secretary of Health & Human*

---

[2] Section 1395x(v)(1)(A) provides, in relevant part:
>  The reasonable cost of any services shall be the cost actually incurred . . . and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included . . . In prescribing the regulations referred to in the preceding sentence, the Secretary shall consider among other things, the principles generally applied by national organizations or established prepayment organizations[.]

*Services*, 668 F.2d 1203, 1209 (6th Cir. 1982); *Goleta Valley Cmty. Hosp. v. Schweiker*, 647 F.2d 894

(9th Cir. 1981) (holding the related-party rule valid as a means to ensure parties deal at arms' length);

*Fairfax Hosp. Ass'n, Inc. v. Califano,* 585 F.2d 602, 606 (4th Cir. 1978). *But see N.W. Hosp., Inc.*

*v. Hosp. Serv. Corp.*, 687 F.2d 985, 996 (7th Cir. 1982) (holding the related-party prohibition invalid

solely as to that portion of the loan equal to the excess of the former for-profit provider's depreciated

cost). The *Fairfax* Court commented:

> Particularly in a program as complex as the Medicare program, with its large numbers of providers and suppliers and with its wide range of supplies and services, the Secretary, in his regulations, may make, and indeed must make, rough accommodations illogical, it may be, and unscientific using generalized classifications governing the method of calculating "reasonable cost" when it is obvious that individualized cost calculations are both not administratively practical and unduly expensive.

*Fairfax Hosp.*, 585 F.2d at 606 (internal citations omitted). While §§ 413.17 and 413.153 may be

somewhat overinclusive, there is no requirement under the deferential *Chevron* standard that the

regulations be so narrowly tailored to the statute so as to preclude this type of administrative

compromise to the reasonable cost problem. Congress has implicitly endorsed such approaches in

its broad grant of authority to the Secretary. We follow those decisions upholding the regulations,

and conclude that §§ 413.17 and 413.153 are rationally related to the purposes of the Medicare

statute.

### III

We now turn to the issue of whether the Secretary's interpretation of §§ 413.153 and 413.17

was reasonable. The Medicare judicial review provision, 42 U.S.C. § 1435oo(f)(1), incorporates the

standard of review applicable to actions arising under Administrative Procedure Act (APA). Section

706(2)(A) of the APA commands reviewing courts to "hold unlawful and set aside" agency action

that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard, our task is not to decide which interpretation between conflicting views best serves the regulatory purpose, but rather to determine if the Secretary has reasonably interpreted his own regulations. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *Girling Health Care, Inc. v. Shalala*, 85 F.3d 211 (5th Cir. 1994). In other words, we will affirm the Secretary's interpretation unless, in light of the language and purpose of the regulation, it is unreasonable. *See, e.g., Marcello v. Bowen,* 803 F.2d 851 (5th Cir. 1986) ("Courts accept the agency's interpretation if it is reasonable in terms of the words of the regulations and the purposes of the statute, even though, as an original matter, the court might have reached a different conclusion.").

SPMH argues that the Secretary erred when he determined that the Foundation controlled SPMH because he based this decision on the relationship of the parties prior to the final agreement to sell the hospital facilities. SPMH contends that § 413.17 requires a tangible mechanism of control, such as a majority of overlapping board members, to exist at the time of the transaction in order for the parties to be related. According to SPMH, in order to deny reimbursement, the regulations required the Secretary to examine the relationship of the parties at the time when they actually consummated the spin-off.

SPMH is correct that the regulations require that the parties be related through control at the time of the transaction. The language of the regulations, as well as the case law interpreting them, however, compel a broader interpretation than SPMH suggests.

Section 413.17 provides that both direct and *indirect* abilities to influence significantly the provider at the time of the transaction establishes control. Thus, while the Foundation may not have

-11-

formally controlled SPMH at the time of the transaction, a decision based solely on this evidence would be insufficient, given the text of the regulations, to preclude a finding of relatedness. If one party possesses the ability to influence significantly the other in the bargaining process so that it could dictate the terms of the ultimate agreement, the requirement that the parties be related through a mechanism of control at the time of the transaction is satisfied.[3]

The regulations, therefore, contemplate a fact-intensive inquiry into the relationship of the parties, logically concluding that direct control over a provider during the bargaining process could result in the continued manifestation of that control in the final agreement.[4] In order to make the determination that the transaction is a product of a bargaining process tainted by one party's ability to control the other, the Secretary should consider "the entire body of facts and circumstances involved." U.S. Dep't of Health and Human Services, Medicare PRM, Part I, § 1004.3.

In this case, the Secretary correctly interpreted the regulations as permitting him to examine the entire bargaining process in order to discern whether the Foundation could directly or indirectly control SPMH through the terms of the "spin-off" and loan agreement. The Secretary's position is supported by the text of the regulations. We cannot conclude, therefore, that the requirement that the parties be related at the time of the transaction renders the Secretary's reading of the regulations

---

[3] This is not to say that the terms of the agreement must actually set an unusually high rate of interest in order to preclude reimbursement. The ability of one party to dictate the terms of an agreement is only suggestive of the possibility that the loan may be unnecessary or at an unreasonable rate of interest. Medicare does not require the actual exercise of control to prove relatedness. *See* Medicare PRM, Part 1, § 1004.3. Instead, it is the potential for a related transaction to result in immoderate reimbursement requests that the Secretary intends the prophylactic relatedness rule to address.

[4] 42 C.F.R. § 413.153(c)(1) provides, in relevant part, that "[p]resence of [control] could affect the 'bargaining' process that usually accompanies the making of a loan, and could thus be suggestive of an agreement on higher rates of interest or of unnecessary loans."

unreasonable.

None of the other textual arguments advanced by SPMH undermine the Secretary's interpretation. SPMH focuses on the first part of the definition of "proper" in § 413.153(b)(3)(i), which requires that reimbursable interest be "incurred at a rate not in excess of what a prudent borrower would have had to pay . . . at the time the loan was made." 42 C.F.R. § 413.153(b)(3)(i). The second part of the definition of "proper" interest, however, directs the Secretary to look at whether the parties are related through control, even in cases in which the interest charged does not exceed fair market rates. The regulation states: "Proper requi res that the interest be. . .paid to a lender not related through control." 42 C.F.R. § 413.153(b)(3)(ii). The provision does not state or even suggest that the only relevant time for determining relatedness is at the time the parties actually effect the transaction. If the Secretary had originally intended to impose such a limitation, similar language would have been included in §§ 413.17 or 413.153(b)(3)(ii). Instead, § 413.153(b)(3)(ii) contemplates a much broader factual analysis in determining whether the parties are related. This contrast between the restrictive time period for comparing interest rates and the more open approach to determining whether the parties are related through control provides further support for the Secretary's interpretation of the provisions.

SPMH also argues that the case law interpreting §§ 413.153 and 413.17 requires that the Secretary only consider whether the parties were related through control at the time of and subsequent to the transaction. A close analysis of these judicial decisions reveals that they do not support SPMH's argument.

SPMH first contends that *Biloxi Regional Medical Center v. Bowen*, 835 F.2d 345 (D.C. Cir. 1987), demonstrates that the relatedness determination should be limited solely to the time of the

-13-

transaction. In *Biloxi Regional*, the court concluded that the city government did not control the Medical Center at the time of the transaction and therefore the parties were not related. *Biloxi Regional*, 835 F.2d at 351. The only possible mechanism of control was the mayor's ability to veto the appointment of potential board members. The court found that the approval process was a mere formality and that the mayor had no power of influence over appointments. *Id* at 351-52. Thus, "any influence the City might exert through the mayor's veto power fell well short of that required to establish control under the regulation." *Id.* at 352.

The court found, based on its analysis of the agreement, that the requirement that the parties be related through control at the time of the transaction was not met. There was no evidence that the city could significantly influence the Medical Center based on their relationship. The court, therefore, did not need to examine the entire negotiating process in making its relatedness determination because the city's complete lack of control over the Medical Center was apparent from the facts existing at the time of the transaction. Where, as in this case, the prior dealings between the parties reveal the potential for a lender to influence a provider, the Secretary necessarily must make a broader inquiry into the surrounding circumstances in order to determine if the parties were, in fact, related at the time of the transaction. The *Biloxi Regional* decision does not preclude this sort of searching analysis.

SPMH also relies on the Third Circuit's decision in *Monsour Medical Center v. Heckler*, 806 F.2d 1185 (1986). Specifically, SPMH focuses on language in the opinion that requires relatedness to be measured "at the time of their borrowing and lending." *Id*. at 1192. SPMH's reliance on this language is misplaced. The *Monsour* decision essentially restates the proposition that the provider must be related to the other party at the time of the transaction in order to preclude reimbursement.

In considering whether such relatedness existed at the time of the loan, however, the Third Circuit approved of the PRRB's examination of "the corporate long-term planning period," which covered a period of six years. Thus, the decision endorses an examination of the entire body of facts and circumstances in reaching the conclusion about the ultimate transaction.

Lastly, SPMH maintains that the Secretary's interpretation would result in an infinitely broad related-parties rule. We do not agree with SPMH's argument that under the Secretary's version of the regulations, no two related parties could ever become unrelated for purposes of Medicare reimbursement. Mere historical associations, without more, are insufficient to establish that the parties are related. They simply provide evidence in making a final determination of relatedness.

The Arizona District Court's decision in *DCH, Inc. v. Bowen*, 1988 WL 235543, Medicare and Medicaid Guide (CCH) ¶ 37,620 (D. Ariz. April 27, 1998), reached a similar conclusion. In *DCH*, the plaintiff appealed the Secretary's decision denying reimbursement because it was related to another health care provider, Republic Health Corporation. The district court disagreed with the Secretary's findings, concluding that mere historical associations between the parties did not amount to substantial evidence that the parties were currently related through control. The court found that their "association [was] diluted by mergers, sales and ultimate abrogation of the corporate relationship. . .." *DCH*, 1988 WL 235543 at *2. The district court looked at the entire body of facts and circumstances in reaching the conclusion that Republic no longer possessed the ability to influence DCH. The court's analysis reveals that such a broad inquiry will not automatically result in a finding that the parties are related. It will result, however, in a more informed determination of whether one party, because of past associations, continues to be able to influence, either directly or indirectly, the actions of another party. This is precisely the reason both the PRM and § 413.153(c)

contemplate an examination of the totality of circumstances, including historical associations and the bargaining process, in deciding whether parties are related through control.

The Secretary has concluded that §§ 413.153 and 413.17 permit consideration of the relationship between the parties during the entire process of negotiation leading up to a transaction in determining whether the parties were related through control at the time of the transaction. Given both the language of these regulations and the case law construing it, we are not persuaded that the Secretary's interpretation is unreasonable and it should therefore be upheld.

**IV**

Having concluded that the Secretary's interpretation of the regulations is reasonable, we now turn to the issue of whether SPMH and the Foundation were related at the time of the spin-off. Our review of the Secretary's final decision is limited to the question of whether substantial evidence supported his determination. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir.1991) (per curiam). "Substantial evidence is more than a scintilla and less than a preponderance. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Muse*, 925 F.2d at 789. If supported by substantial evidence, the decision of the Secretary is conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971).

The district court found substantial evidence that the Foundation had the power, directly or indirectly, to influence significantly SPMH at the time of the transaction. Our own review of the record convinces us that this decision was correct.

The record establishes that the Foundation fully controlled the transfer of hospital assets and operations as part of an overall strategy to restructure its organization. Importantly, there is no evidence that the Foundation's Board actively negotiated the terms of the agreement with SPMH's

-16-

Board.  Despite meeting four times before the execution of the agreement, there is no evidence in the record that SPMH's Board ever discussed the purchase of the hospital.  In fact, as the district court found, the Foundation had already determined that the sales price would be net book value at 6% interest per annum and SPMH simply accepted these terms as offered.  Thus, the agreement was not the product of an arms' length negotiation, but rather part of a pre-packaged plan offered by the Foundation to spin-off the hospital facilities.

SPMH emphasizes the fact that the overlapping Board members resigned six days before the transaction to show lack of control.  SPMH argues that the Foundation no longer possessed any formal mechanism through which to exercise influence over SPMH.  This argument, however, ignores the fact that the Foundation completely controlled SPMH's participation in the transaction throughout the entire bargaining process.  The decision of the PRRB addresses this point well: "The reality that the transaction was executed almost precisely as planned demonstrates the continuation of substantial control in fact."  *Sid Peterson Mem. Hosp. v. Blue Cross & Blue Shield Ass'n.*, PRRB Dec. No. 99-D24 (March 26, 1997).  To conclude otherwise would place the formal composition of the boards of the parties above the true substance of their relationship and invite strategic planning in order to obtain reimbursement for transactions between related parties.

Thus, we hold that the district court correctly found substantial evidence of control in the Foundation's ability to conceive, orchestrate, and execute the sale of the hospital facilities without negotiation or compromise.

**V**

In the alternative, SPMH argues that even if the Foundation and SPMH are related parties, the statute does not automatically require us to deny reimbursement of interest expenses.  SPMH

-17-

contends that we should consider the factual circumstances of the parties, calling attention to the charitable purpose of the sale and the fact that the interest rate charged was not excessive.

SPMH first relies on a Virginia district court opinion, *South Boston General Hospital v. Blue Cross of Virginia*, 409 F. Supp. 1380 (W.D. Va. 1976), for the proposition that in certain cases where the Secretary has made a determination that the parties are related, the courts should fashion an equitable exception to avoid injustice. In *South Boston*, the court sustained a determination that two hospitals were related, but nevertheless overturned a PRRB decision denying interest expenses. The court held that the Secretary could not rely on the related-party rule in order to deny reimbursement. Instead, the court required the Secretary to scrutinize the facts of each transaction in order to determine if the interest rate was excessive. *Id*. at 1385.

The need for broad prophylactic rules is particularly apparent in a program as complex and ripe with the potential for abuse as the Medicare reimbursement scheme. Recognizing this need, several courts have declined to follow the reasoning in *South Boston*. *See, e.g.*, *Jackson Park Hosp. Found. v. United States*, 659 F.2d 132, 137 n. 13 (Cl. Ct. 1981). For instance, the Ninth Circuit, in *American Hospital Management Corporation v. Harris*, 638 F.2d 1208 (9th Cir. 1981), concluded that the prophylactic rule was a reasonable interpretation of the statute and that there was no legislative requirement that every transaction be scrutinized for fairness. The court stated:

> We recognize that the refusal of the Secretary to scrutinize the fairness of each transaction found to be covered . . . will occasionally work unfair results. However, given the limited scope of this court's review of the Secretary's actions in promulgating that regulation, we cannot say that the challenged regulation bears no reasonable relationship to the enabling legislation that it was designed to implement, or to the more narrow objective that the regulation was designed to achieve.

*Id*. at 1213. We agree with the *Harris* court in rejecting the reasoning of *South Boston*. It is well

within the power of an agency to promulgate prophylactic regulations which are broad in scope in order to effectuate the purposes of the enabling legislation. *See Mourning v. Family Publ'ns. Serv.*, 411 U.S. 356, 372-73 (1973). The regulations at issue in this appeal reasonably support the legitimate goals of avoiding reimbursement of improperly increased interest expenses with a minimum of administrative burden. The Secretary has made a determination that the efficient administration of the Medicare program requires a prophylactic rule in order to prevent transactions likely to result in excessive payments by the government. Congress has granted the Secretary the authority to make such decisions. *See* 42 U.S.C. § 1395x(v)(1)(A)(i). While the application of the related-party rule here might, arguably, be "overinclusive" in relation to the regulatory purpose of preventing reimbursement for inflated interest rates, it is not arbitrary or unreasonable. *See Knebel v. Hein*, 429 U.S. 289, 296-97 (1977) (applying this deferential standard to a broad agency interpretation of the Food Stamp Act).

SPMH also cites a Court of Claims opinion, *Trustees of the University of Indiana v. United States*, 618 F.2d 736 (Cl. Ct. 1980), in support of its argument. Unlike *South Boston*, the Claims Court did not consider the issue of whether the related-party rule was valid. Instead, the court interpreted the regulation as allowing an equitable exception. The facts of *Indiana University* are unique. The hospital in *Indiana University* was a state teaching hospital that was part of the University of Indiana. While the University received state funds, Indiana law prohibited the use of those funds for the hospital. The hospital, however, could not borrow money from outside the university since it was not a separate legal entity. In order to free the hospital from this funding vice, the university loaned the hospital funds at a rate that was consistently below the prime rate.

The court permitted reimbursement, but carefully limited its holding to the unusual facts of

-19-

the case. *Indiana University* is limited to cases where the only source for authorized loans was from a related-party. As the district court found, the facts in this case are distinct from those in *Indiana University*. Here, SPMH and the Foundation were legally separate entities. SPMH was not barred by state law from pursuing other sources of funding. Thus, the holding in *Indiana University* does not control the facts of this case.

Given the foregoing, SPMH has failed to demonstrate that a court-made, equitable exception to the related-party rule is applicable.

## VI

We hold that 42 C.F.R. §§ 413.153 and 413.17 are consistent with the text of the Medicare statute. Moreover, we hold that the Secretary's interpretation of those provisions is reasonable and his decision denying the reimbursement of interest expenses is supported by substantial evidence. We also find that there is no equitable exception to the related-party rule. For the above-mentioned reasons, the decision of the district court is AFFIRMED.