BEVERLY ENTERPRISES, Plaintiff,

v.

Joseph A. CALIFANO, Jr., Secretary, Health, Education, and Welfare, and Mutual of Omaha, Defendants.

Civ. A. No. 77–0459.

United States District Court, District of Columbia.

Feb. 17, 1978.

**600**

Robert L. Ackerly, Herbert L. Fenster, Allen B. Green, Washington, D. C., for plaintiff.

Earl J. Silbert, U. S. Atty., Robert N. Ford, Joseph Guerrieri, Jr., Asst. U. S. Attys., Washington, D. C., for defendants.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

This case is before the Court on cross-motions for summary judgment. Upon consideration of the memoranda filed, the affidavits, and the administrative record, the Court finds that there are no genuine issues as to any material facts remaining in this case and that plaintiff's motion for summary judgment be granted in part and denied in part.

## I. BACKGROUND

1. Plaintiff, Beverly Enterprises (Beverly) owns and operates four facilities involved in this case, and has since the time this dispute arose. Each of these facilities participates in the Medicare program as a "provider" of skilled nursing care. These providers are:

Beverly Manor Convalescent Hospital
Capistrano Beach, California

Beverly Manor Convalescent Hospital
Seal Beach, California

Beverly Manor of Laguna
Laguna Hills, California

Beverly Manor of Petosky
Petosky, Michigan

2. Each facility further is properly described as a "distinct-part provider," rendering care as a "skilled nursing facility" (SNF) to Medicare patients in a distinct part of its physical plant. This distinct part must be physically separated from the rest of the institution.

3. The distinct part in which Medicare-eligible patients are cared for is termed the "certified" part. The other part of the facility is termed the "noncertified" part. A patient in a room located in the noncertified part of a distinct-part provider cannot qualify for reimbursement under the Medicare program.

4. Most "providers" under the program do not receive their Medicare reimbursements directly from the Department of Health, Education and Welfare (HEW), but rather from a fiscal intermediary, usually an insurance company. The intermediary then is reimbursed by HEW. The fiscal intermediary pays the hospital on a monthly estimated basis for services rendered to certified Medicare patients, audits on a yearly basis the hospital's cost records in order to make the final determination of "reasonable costs," and notifies the provider if, in its opinion, any "overpayments" have been made to the provider in monthly estimated payments made during that year. If the intermediary considers overpayments to have been made, it furnishes the provider

with a Notice of Program Reimbursement (NPR), which itemizes adjustments to the provider's Medicare cost reports for that year. The provider then is deemed to owe the intermediary and HEW the amount stated in the NPR. If the provider disagrees with the intermediary's decision, it may appeal to the Provider Reimbursement Review Board (PRRB). The fiscal intermediary for the four Beverly facilities was and is Mutual of Omaha.

5. In August 1973, the Social Security Administration published section 2342 of the Provider Reimbursement Manual (HIM–15) (PRM). The PRM is a guide for fiscal intermediaries in their decision-making processes concerning reimbursement claims submitted by providers each fiscal year.

6. Section 2342 and subsection 1 of the PRM read as follows:

Where the unoccupied beds in a partially certified institution are concentrated in the certified portion, the standby costs attributable to the unoccupied beds (e. g., depreciation, operation of plant, etc.) would not be allocated equitable under existing cost find methods. This section indicates the manner in which costs attributable to a provider's unoccupied beds are allocated under such circumstances so that the burden of these costs is proportionally shared by all patients in the institution. This section is applicable to all cost reporting periods beginning after September 30, 1973.

2342.1 *General Rule*—Where the average occupancy rate of a certified portion of an institution is substantially less than the average occupancy rate in the noncertified portion, the routine costs attributable to the unoccupied beds of the institution allocated on the basis of space (see subparagraph B) are reallocated using the following basis:

$$\frac{\text{Total Patient Days in the Certified Portion}}{\text{Total Patient Days in the Entire Institution}} \times \text{Costs of Unoccupied Beds} = \frac{\text{Cost of Unoccupied Beds Allocable to Certified Portion}}{}$$

Only costs allocated to the inpatient areas on the basis of space are adjusted since other costs are allocated in a manner related to the actual usage of services in the institution—e. g., hours of services, meals served, etc.

A. *Substantial Difference in Occupancy Rates*—For this purpose, a difference of 25 percentage points or more in the occupancy rates in any Medicare cost reporting period is considered substantial. Thus, if the occupancy rate in the certified portion of an institution is 50 per cent and the occupancy rate is 75 per cent or more in the noncertified portion, the procedure described in this section is applicable.

B. *Costs Allocated on Basis of Space* —All costs actually allocated or required to be allocated to the inpatient areas on the basis of space under the cost-finding requirements are included in the computation.

7. Section 2342.2 provides an exception to the allocation procedure set forth in section 2342.1. A distinct-part provider qualifies for the exception where its certified, or Medicare portion:

A. has in its inpatient areas *staffing separate* from that of the inpatient areas in the remainder of the institution, and also

B. furnishes a level of care that is *not substantially equivalent* to that furnished in the noncertified portion of the institution. (For this purpose, the level of care furnished by the noncertified portion is considered substantially equivalent to the level of care furnished by a skilled nursing home if that portion meets at least the requirement that it is primarily engaged in providing skilled nursing care and related services to inpatients who require medical or nursing care, or rehabilitation services for injured, disabled, or sick persons.) The information as to the level of care in both portions of a skilled nursing facility (SNF) is contained in the *Directory of Medical Facilities* issued by the Social Security Administration and made available to fiscal intermediaries under the program.

8. As of August 1973, each distinct part, or certified Medicare portion of plaintiff's four facilities, had in its inpatient area staffing separate from that of its noncertified part. Plaintiff thus satisfied section 2342.2(A).

9. Plaintiff, however, was uncertain as to whether the certified portions of any or all of its four facilities were furnishing a level of care "not substantially equivalent" to the level of care in the noncertified portions, in accordance with the second test for the exemption. Section 2342.2(B).

10. Mr. L. E. Addleman, Supervisor, Government Programs, Beverly Enterprises, determined that, unless the four facilities could qualify for the exception provided in section 2342.2, Beverly would have to increase fees in the coming fiscal year 1974 for patients in the noncertified portions of these facilities, in order to compensate for the substantial Medicare reimbursement revenue which would be lost if the allocation of standby fees mandated by section 2342.1 were applied.

11. On December 19, 1973, Mr. Addleman telephoned Mr. Terry F. Hamaker, Desk Audit Supervisor, Audit and Reimbursement, for plaintiff's fiscal intermediary.

12. On behalf of Mutual, Mr. Hamaker followed up that telephone conversation the same day by letter to Mr. Addleman. Mr. Hamaker wrote:

This is in regard to the phone conversation we had today concerning Section 2342 of HIM–15 "allocating standby costs in a distinct-part provider having a substantial difference in occupancy rates between the certified portion and the noncertified portion."

We find that the Beverly facilities which we are intermediary for do not appear to be subject to this allocation for the 1972 fiscal year. This is based upon two exceptions in 2342.2 stating that this allocation is not applicable if the facility (1) has separate staffing, and (2) provides a level of care in the certified area which is not equal to the level of care provided in the non-certified area.

However, if it was found that a substantial number of patients were in the noncertified area and required the level of care provided in the certified area, the allocation of standby costs under this computation would likely be applicable. You must keep in mind that the exceptions listed in Section 2342.2 are very general and to determine their applicability could require an in-depth analysis of nursing care. Should such an analysis reveal that the exceptions were not met, then, of course, an adjustment would be necessary.

If you should have any further questions, feel free to contact me.

13. Plaintiff determined that, because its intermediary had stated that plaintiff qualified for the exemption in section 2342.-2, it would not be necessary to increase fees in the 1974 fiscal year for its non-Medicare patients in the noncertified portions of its facilities to account for the allocation in section 2342.1. Plaintiff therefore did not increase its fees for noncertified patients in 1974.

14. On December 18, 1975, the fiscal intermediary rendered its reimbursement decision for the year ending December 31, 1974. The intermediary applied the allocation procedure of section 2342.1 to the four plaintiff facilities. The intermediary did not contest that staffing was separate for the certified and noncertified portions. The intermediary did, however, state that the levels of care in each of the distinct parts were substantially equal. The result was the disallowance of $58,343.00 of standby costs.

15. At no time did the intermediary, prior to the submission of its reimbursement decision for the year ended December 31, 1974 (which is dated December 18, 1975), in any way indicate that it no longer considered the facilities to be exempt from the allocation procedure of section 2342.1.

16. At no time since December 19, 1973, have plaintiff's facilities been inspected by or on behalf of the intermediary or any other person or entity for the purpose of

ascertaining the applicability of section 2342 of the PRM.

17. Neither the separate staffing arrangements nor the general level of care have been changed in any of the plaintiff's facilities since the date of publication of section 2342.

18. Plaintiff accordingly protested to the intermediary. Plaintiff was unable to increase retroactively charges to patients who had received services in the noncertified portions of its four facilities during 1974 and stood to suffer an unexpected loss of $58,343.00.

19. On February 12, 1976, the fiscal intermediary wrote a letter to the Chief, Provider Reimbursement and Accounting Policy. The intermediary asked that the application of section 2342 be suspended with regard to plaintiff for the year ending December 31, 1974, "because of the confusion surrounding the issue at that time."

20. The intermediary's request for suspension of the application of section 2342 was denied. Plaintiff timely appealed the intermediary's disallowance of standby costs at the four facilities to the Provider Reimbursement Review Board. The Board considered the case on the written record.

21. On January 14, 1977, the PRRB handed down its decision. The Board affirmed the intermediary's adjustments to reallocate standby costs from the certified portion to the noncertified portion of the facilities, and thereby to disallow $58,343.00 in standby costs.

22. The Commissioner of Social Security, to whom the Secretary of Health, Education and Welfare has delegated the responsibility for administration of the Social Security Act, by letter of March 1, 1977, declined to reverse, affirm, or modify, on his own motion, the Board's decision.

23. On March 16, 1977, plaintiff filed the complaint in this action for judicial review of the Board's decision.

## II. DISCUSSION

Plaintiff brought this suit seeking judicial review of the Provider Reimbursement Review Board's (PRRB) decision to disallow the reimbursement to plaintiff of standby costs in the amount of $58,343.00. Plaintiff challenges this final agency action on three grounds: (1) that the Board's decision that the doctrine of estoppel is inapplicable is erroneous; (2) that the Board's decision that § 2342 of the Provider Reimbursement Manual is not arbitrary and capricious is erroneous; and (3) that the Board's finding that there were "substantially equivalent" levels of care in the certified and noncertified parts of plaintiff's facilities is not supported by substantial evidence in the record as a whole. For the reasons hereinafter stated, the Court finds that the Board's decision was correct in concluding that the estoppel theory is inapplicable and that § 2342 is not arbitrary and capricious. However, the Court finds that the Board's decision that the levels of care were "substantially equivalent" is not supported by substantial evidence in the record as a whole.

### A. Scope of Review.

Judicial review of PRRB decisions is limited in scope to that set out in section 10(e) of the Administrative Procedure Act. 42 U.S.C. § 1395oo(f)(1). That section states:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> \* \* \* \* \* \*
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> \* \* \* \* \* \*
>
> (E) unsupported by substantial evidence in a case . . . reviewed

on the record of an agency hearing provided by statute . . .

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706. Thus, as to questions of fact, the Court must determine whether, upon review of the record as a whole, the decision of the PRRB is supported by substantial evidence. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 474, 95 L.Ed. 456 (1951). However, as to questions of law, the Court must determine whether the correct legal standard was applied, regardless of the evidence. *See Barnard v. Weinberger, CCH Medicare and Medicaid Guide, 1974 Transfer Binder,* ¶ 26,-847, at 9485 (E.D.Mich., Dec. 23, 1973).

B. *The Finding by the Board that the Doctrine of Estoppel is Inapplicable in this Case is Supported by Substantial Evidence.*

Plaintiff claims that the defendants are estopped from applying § 2342 of the Manual to them, thereby requiring the plaintiff to allocate the standby costs. It bases this argument on a letter dated December 19, 1973, from the intermediary, Mutual of Omaha, to the plaintiff, which stated, in pertinent part:

We find that the Beverly facilities which we are intermediary for do not appear to be subject to this allocation for the 1972 fiscal year. This is based upon the two exceptions in 2342.2 stating that this allocation is not applicable if the facility (1) has separate staffing and (2) provides a level of care in the certified area which is not equal to the level of care provided in the non-certified area.

However, if it was found that a substantial number of patients were in the non-certified area and required the level of care provided in the certified area, the allocation of standby costs under this computation would likely be applicable. You must keep in mind that the exceptions listed in Section 2342.2 are very

general and to determine their applicability could require an in-depth analysis of nursing care. Should such an analysis reveal that the exceptions were not met, then, of course, an adjustment would be necessary.

The Board found the doctrine of estoppel inapplicable to this case because the intermediary's response was directed to a prior year (1972) rather than to the year in issue (1974), and because it was not a final decision. The plaintiff argues that although the letter did refer to the year 1972, the level of care did not change, and, therefore, it was reasonable for the plaintiff to rely upon the intermediary's statement of a prior year in determining whether § 2342 would be applicable to them in a subsequent year.

 Upon a careful review of the letter, the Court is convinced that the Board's decision that estoppel is inapplicable here is based on substantial evidence. For the doctrine of estoppel to apply, the plaintiff's reliance must be reasonable. *See Brown v. Richardson,* 395 F.Supp. 185, 191 (W.D.Pa. 1975). The Court finds substantial evidence that plaintiff's reliance on the letter was not reasonable. The letter makes a finding only as to the year 1972—and that finding is not a definite one in that the letter uses the phrase "do not appear." The letter also is couched in cautionary language indicating the tentativeness of the 1972 assessment. The letter states that if a contrary determination were made as to the levels of care, the applicability of § 2342.2 would change. Furthermore, the letter explicitly informed the plaintiff that the exceptions in the statute were general but that "to determine their applicability could require an in-depth analysis. . . ." Consequently, the cautionary thrust of the letter renders unreasonable plaintiff's reliance on the letter for any years subsequent to 1972. The doctrine of estoppel is thus not applicable in this case, and the Board's decision was based upon substantial evidence in the record as a whole.

C. *The Board Correctly Concluded that Section 2342 of the Provider Reimbursement Manual is Not Arbitrary and Capricious.*

■ As already described, § 2342 provides, in certain circumstances, for the allocation of standby, or routine costs (such as depreciation, maintenance, etc.) in a distinct-part provider[1] having a substantial difference (25%) in occupancy rates between its certified and noncertified portions. Plaintiff makes three arguments in support of its contention that § 2342 is arbitrary and capricious. First, plaintiff argues that the allocation of standby costs among *all* patients has the effect of requiring persons in the noncertified part to bear the costs of the certified part, thus contravening 20 C.F.R. § 405.402(a).[2] Second, plaintiff asserts that the 25% discrepancy induces hospitals to put patients in the various parts based on the artificial purpose of avoiding developing differentials in the rates of occupancy (so as to avoid allocation under § 2342), rather than according to the level of care the patient requires. Third, plaintiff argues that the 25% figure is arbitrary in that at 24.9%, the allocation method of § 2342 is not applied, while at one-tenth of one per cent more, it is applied. For the reasons hereinafter stated, the Court finds that § 2342 is not arbitrary and capricious, but is designed to make the Medicare program more equitable.

Under the Medicare program, providers are reimbursed for the "reasonable costs" of providing health care to beneficiaries. A distinct-part provider can be reimbursed only for the costs attributable to the certified part of the facility. Indirect costs (e. g., overhead, including standby costs) present allocation problems. Because it would be time-consuming and expensive to attempt to maintain precise data on the proportion of indirect costs used by each portion of a facility, several allocation methods have been developed. Section 2342 is just such a method.

In normal operating circumstances, a provider may use the simplest allocation method—that based on area (square feet). Thus, if the certified part accounted for 30% of the accommodation area, it would be allocated 30% of the indirect costs of the facility, which would be reimbursable. This method, however, results in an equitable distribution of indirect costs only in facilities with normal *utilization* patterns. The indirect costs of a facility with a significant disparity in occupancy rates would not be equitably distributed—according to the purpose of the program, to reimburse for reasonable costs of providing health care to beneficiaries—if the area-based allocation were applied. For example, if a certified part constitutes 70% of the accommodation area and, because of a disparity in utilization rates, the certified part constitutes only 10% of all the patient days (a unit of usage) in the entire facility, the area-based allocation would result in those few (10%) covered by Medicare being allocated 70% of the indirect costs of the facility. This results in the Medicare program reimbursing providers for costs unrelated to the proportional costs of providing health care to beneficiaries.[3] Therefore, the Secretary of

1. *See* Background Nos. 2 and 3, *supra.*
2. The relevant part of this regulation states:
 All necessary and proper expenses of an institution in the production of services, including normal standby costs, are recognized. Furthermore, the share of the total institutional cost that is borne by the program is related to the care furnished beneficiaries so that *no part of their cost would need to be borne by other patients.*
 20 C.F.R. § 405.402(a) (emphasis added).
3. In fact, it is this type of hypothetical that § 2342 seeks to deter. If an area-based allocation were always used, facilities need only increase the size of the certified part to include many unoccupied beds and, thereby, receive a greater portion of reimbursement for indirect costs than the usage of the facility by certified patients would justify. As soon as the number of unoccupied beds in the certified part substantially exceeds those in the noncertified part, § 2342, with its usage-based allocation, applies to prevent providers from reaping benefits unrelated to the cost of health care provided to beneficiaries.

HEW has determined that when the occupancy rates of the two parts of a facility differ by 25% or more, the allocation of the indirect costs must be made according to the *usage* of the "indirect services" (*i. e.*, patient days), because usage will more closely approximate the cost of providing care to beneficiaries than will area.[4]

Plaintiff's contention, then, that § 2342 allocates standby costs of the certified part among *all* patients in the facility, is inaccurate. Section 2342 does *not* require standby costs of the certified part to be borne by noncertified patients; rather, it achieves a proper allocation of standby costs so that each part bears its own costs according to its proportion of usage. Contrary to plaintiff's assertion, this is clearly consistent with 20 C.F.R. § 405.402(a).[5]

Plaintiff's next contention—that § 2342 will cause providers to place patients, regardless of the level of care they require, in the various parts of the facility for the artificial purpose of avoiding the differential—does have superficial appeal. However, while the differential may be avoided in this way, it may also be avoided by altering the size of the parts, without interfering with the level of care required of the individual patients.[6] Moreover, while facilities may seek to avoid the differential, there is no indication that facilities will act other than in good faith when assigning patients to the various parts.

The plaintiff also argues that the 25% differential figure is arbitrary and capricious because of the different impact one-tenth of one per cent may cause. This argument, however, proves too much: Most tables and cut-off figures used by the government would thus be declared invalid under this rationale. The Supreme Court recognized this in an analogous situation in *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

> In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific."

397 U.S. at 485, 90 S.Ct. at 1161 (citations omitted). Therefore, although the 25% figure may be "imperfect," the Court will defer to the Secretary's decision that 25% represents a *significant* under-utilization of certified part facilities such that a separate cost allocation method is required to discourage facilities from maintaining extra certified part beds not needed in a community,[7] while permitting facilities without a substantial differential to use simpler accounting methods. Accordingly, the Court finds the Board's decision that § 2342 is not arbitrary and capricious to be correct.

---

4. Section 2342 provides the formula that allocates one of these indirect costs, standby costs, according to patient days:

$$\frac{\text{Certified Part Patient Days}}{\text{Total Patient Days}} \times \frac{\text{Standby}}{\text{Costs}} = \frac{\text{Certified Part}}{\text{Standby Costs}}$$

$$\frac{\text{Noncertified Part Patient Days}}{\text{Total Patient Days}} \times \frac{\text{Standby}}{\text{Costs}} = \frac{\text{Noncertified Part}}{\text{Standby Costs}}$$

5. *See* note 2 *supra.*

6. The reason the level of care will not be impaired is that the noncertified part may vary from custodial care to skilled nursing care. Therefore, patients placed in this part will *not* suffer because they require a greater level of care.

7. *See* note 3, *supra.*

D. *The Board's Finding that There Were "Substantially Equivalent" Levels of Care in the Certified and Noncertified Parts of Plaintiff's Facilities is Not Supported by Substantial Evidence in the Record as a Whole.*

One of the requirements that a facility must meet in order for the exemption to § 2342 to apply is that the facility

furnishes a level of care that is not substantially equivalent to that furnished in the noncertified portion of the institution. (For this purpose, the level of care furnished by the noncertified portion is considered substantially equivalent to the level of care furnished by a skilled nursing home if that portion meets at least the requirement that it is primarily engaged in providing skilled nursing care and related services to inpatients who require medical or nursing care, or rehabilitation services for injured, disabled, or sick persons.) The information as to the level of care in both portions of a skilled nursing facility (SNF) is contained in the Directory of Medical Facilities issued by the Social Security Administration and made available to fiscal intermediaries under the program.

▆ Based on this, the defendant points out that the level of care furnished by the noncertified part is considered "substantially equivalent" to that in the certified part if the former is "primarily engaged in providing skilled nursing care and related services to patients who require medical or nursing care, or rehabilitation services for injured, disabled, or sick persons." Defendant argues that because the quoted test is similar to the definition of "skilled nursing facility" in § 1861(j)(1) of the Act, 42 U.S.C. § 1395x(j)(1), and because the facilities involved herein have been certified by their

respective states as meeting the criteria for § 1861(j)(1), the "substantially equivalent" test is met and the facilities do not qualify for the exemption to § 2342. The plaintiff argues in response that this is a *post hoc* rationalization and that the Board was never informed of the facilities' § 1861(j)(1) status for fiscal 1974. The Court agrees.[8]

▆ The Medicare Act provides that judicial review of PRRB decisions must be based on substantial evidence in the *record.*

A decision by the Board shall be based upon the *record made at such hearing, which shall include* the evidence considered by the intermediary *and such other evidence as may be obtained or received by the Board,* and shall be supported by substantial evidence when the record is reviewed as a whole.

42 U.S.C. § 1395oo (d). As the Supreme Court pointed out in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 418–19, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971), a court reviewing an agency's decision on the "substantial evidence" test may *not* consider " '*post hoc* ' rationalizations . . [because] . . . they clearly do not constitute the 'whole record' compiled by the agency . . . [R]eview is to be based on the full administrative record that was before the Secretary at the time he made his decision." *See American Petroleum Institute v. EPA,* 540 F.2d 1023, 1029 (10th Cir. 1976), *cert. denied,* 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977). Upon a review of the entire administrative record, the Court finds, and the defendant admits,[9] that the Board was never informed that the noncertified parts of the four facilities in question met the definition of § 1861(j)(1), whether by state survey agency determinations or otherwise. The Board's decision does not even suggest that this issue was ever considered. Moreover,

---

8. The Court wishes to note that nothing in this Memorandum Opinion should be construed as indicating the validity of the defendants' § 1861(j)(1) argument. The Court need not reach that issue at this time.

9. *See* Defendants' Supplemental Memorandum at 2 (January 16, 1978).

in the introductory section of the Board's decision summarizing the sections of the Medicare Act appropriate to this case, § 1861(j)(1) was omitted.[10] Accordingly, the Court cannot find that the Board's decision was based on substantial evidence *in the record as a whole.*

In addition to the evidence supporting the Board's decision, the contrary evidence introduced further supports the Court's conclusion. In determining whether the Board's decision is supported by substantial evidence in the record "as a whole," the Court may consider evidence that is opposed to the agency's decision. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 474, 95 L.Ed. 456 (1951); *Timken Co. v. Vaughan,* 413 F.Supp. 1183, 1189 (N.D.Ohio 1976). The plaintiff introduced much evidence into the administrative record indicating that the level of care in the certified part was "*not* substantially equivalent" to, but was higher than, the level of care in the noncertified part of the facility: a higher ratio of total nursing staff to patients, a higher ratio of licensed to nonlicensed nursing staff persons, twice as many nursing hours per patient day, 2½ times as much wages, a higher utilization of nursing supplies and other ancillary services per patient, different treatment programs, higher quality medical procedures and restorative techniques, etc. *See* Affidavit of L. E. Addleman, Exhibit 6 (November 16, 1976). Thus, in light of the evidence introduced to show that the levels of care were "not substantially equivalent," the Court is further convinced that the Board's decision that the levels were "substantially equivalent" is not based on substantial evidence in the record as a whole.

### III. CONCLUSION

Upon a careful review of the administrative record, the Court concludes: that the Board's finding that the doctrine of estop-

pel is inapplicable in this case is based on substantial evidence; that the Board correctly concluded that § 2342 of the Provider Reimbursement Manual is not arbitrary and capricious, but a valid exercise of the Secretary's authority; and that the Board's finding that there were "substantially equivalent" levels of care in the certified and noncertified parts of plaintiff's facilities is not supported by substantial evidence. In light of these conclusions, the Court will remand the case to the Board to undertake a thorough evaluation of whether the levels of care plaintiff offers in its certified and noncertified parts are "substantially equivalent."

An order in accordance with the foregoing will be issued of even date herewith.

10. Defendants argue that the Board was informed of the § 1861(j)(1) status of the plaintiff's facilities at pages 45–46 of the Administrative Transcript (Intermediary's Position Paper (First Supplement)). All that this highly ambiguous part of the record does is to state

that a survey "would have been accomplished in 1967 or 1968 or later at the time the facility was organized." This is all that was before the Board; it was never informed of the status of the facilities in 1974, the year in issue.