**HOME HEALTH SERVICES OF GREATER PHILADELPHIA, INC.**

v.

**Patricia HARRIS, Secretary of Health, Education and Welfare.**

**Civ. A. No. 79–3161.**

United States District Court,
E. D. Pennsylvania.

Jan. 22, 1982.

Donna D. Fraiche, New Orleans, La., Norman M. Berger, Philadelphia, Pa., for plaintiff.

Peter F. Vaira, Jr., U. S. Atty., Joseph M. Masiuk, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

In this matter, the Court reviews pursuant to section 1878(f)(1) of the Social Security Act, 42 U.S.C. § 1395 oo(f)(1), a final decision of the Department of Health, Education and Welfare (HEW) disallowing certain claims of plaintiff, Home Health Services of Greater Philadelphia, Inc. (Home Health) for Medicare reimbursement for the cost year ending June 30, 1975. The decision, rendered by the Administrator of HEW's Health Care Financing Administration (Administrator) on July 1979, affirmed the determination of the intermediary, HEW's Division of Direct Reimbursement (Intermediary) and reversed that of the Department's Provider Reimbursement Review Board (PRRB). Since this action must be decided upon a review of the administrative record, the parties have appropriately filed cross-motions for summary judgment. Based upon our review of the entire record and the administrator's decision, the Court has determined that the decision of the Administrator must be vacated in that it is not supported by substantial evidence.

### I. *Background*

Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq., establishes a two-part program of federal reimbursement for medical care for the aged and disabled commonly known as "Medicare." Part A of the program provides "hospital insurance" benefits (in-patient hospital and post-hospital extended or home health care) and is financed by Social Security payroll contributions. Sections 1811–1818 of the Social Security Act, 42 U.S.C. §§ 1395c–1395(i)–2. Part B provides "medical insurance" benefits for physician services, and out-patient services and supplies, and is financed by premium payments of enrollees together with contributions from funds appropriated by the federal government. Sections 1831–1844 of the Social Security Act, 42 U.S.C.

§§ 1395j–1395w. Both parts of the program are administered by the Medicare Bureau of the Health Care Financing Administration.

Health care providers (hospital, skilled nursing facilities, and home health agencies) that have filed an agreement with the Secretary pursuant to section 1866 of the Social Security Act, 42 U.S.C. § 1395 cc, may participate in the medicare program. Under Part A of the Social Security Act, the "reasonable cost" of covered services rendered by providers to Medicare beneficiaries is paid directly to the providers in lieu of reimbursing Medicare beneficiaries. 42 U.S.C. § 1395(f)(b). In order not to delay reimbursement payments until a final determination of the reasonable cost of the services, interim estimated payments are made to providers at least monthly, with subsequent adjustments for overpayments and underpayments, 42 U.S.C. § 1395g, § 1395 x(v)(1)(A)(ii); 42 CFR § 405.405. A final determination as to reimbursable costs is made after the close of the provider's fiscal year, based upon a cost report which the provider is required to file. 42 CFR § 405.406(b). The reasonable cost of services rendered by the provider to program beneficiaries is initially determined by a fiscal intermediary, in this case HEW's Division of Direct Reimbursement (Intermediary), who is responsible for the processing of claims and the payment of funds to the provider. A provider who is dissatisfied with the intermediary's reimbursement decision, may request a hearing before the Provider Reimbursement Review Board (PRRB) where the amount in controversy is $10,000 or more. 42 U.S.C. § 1395 oo(a). Within sixty days after a PRRB decision, the Secretary of HEW, on his or her own motion, may reverse or modify the decision. 42 U.S.C. § 1395 oo(f)(1). The district court is given jurisdiction to review any final decision of the PRRB or any reversal, affirmance or modification by the Secretary. *Id.* Such an action "shall be tried pursuant to the applicable provisions under Chapter 7 of Title 5 [the Administrative Procedure Act], notwithstanding any other provisions

in section 405 of this title [42]." 42 U.S.C. § 1395 oo(f)(1).

## II. *Facts*

On July 7, 1971, plaintiff, Home Health, entered into a contractual agreement with Unihealth Services Corporation (Unihealth) whereby Unihealth would provide certain services to Home Health. Unihealth is a New Orleans, Louisiana-based management company which assists in establishing non-profit home health agencies and assists them also in the necessary start-up and operation of the agency. The agreement between Unihealth and Home Health provided for start-up services, professional management services, financial and health care consultation, on-call and data processing services. Unihealth charged an initial "start up" fee of $12,500 and a fee of 7% of the gross billings of Home Health for its continuing services. In January 1975, the fixed 7% fee was changed to a sliding scale charge whereby the percentage fee for services would decline as Home Health's volume of gross billings increased.

On August 3, 1973, Home Health was certified as a provider of Medicare services. Home Health submitted its first cost report for the fiscal year ended 1974. It reflected the management fees for Unihealth for that year as well as the amortized start-up fees. After an audit ordered by the Intermediary, the management fees as charged by Unihealth were found reasonable and a Notice of Program Reimbursement was issued which made no adjustment as to the cost figures submitted by Home Health relating to the services supplied by Unihealth.

The following year, Home Health submitted a cost report for the fiscal year ending June 30, 1975. In the report, Home Health claimed that it incurred $32,872 in fees for management services provided by Unihealth. On April 28, 1976, the Intermediary issued a Notice of Program Reimbursement for the fiscal year ending June 30, 1975 in which it disallowed $12,720 of the Unihealth management fees and allowed reimbursement in the amount of $20,152. The explanation for the adjustment contained in the notice read:

To correct management fee in accordance with "sliding scale" fee schedules as modified in contract per letter dated January 3, 1974. Adjusted amounts include billing adjustments and accruals.

On or about August 17, 1976, the director of the Intermediary wrote the administrator of Home Health and stated,

As you were advised in my letter of April 28, 1976, your cost report for the period ending June 30, 1975, was settled without audit. A reduction in the amount of $12,720.00 was made to the management fee due Unihealth Services Corporation. Subsequent to this cost adjustment, representatives of the Division of Direct Reimbursement visited Unihealth Headquarters to review their organizational activities to explore the relationship between the services rendered by Unihealth and the management fees charged. Although no final determinations have been made, we have decided that the disallowance of $12,192 be restored to your costs. The additional adjustment is for $528 representing accrual and debit and credit memos per your detail of management fees. . . .

The approval of this payment is not to be construed as a blanket approval for all future management fees. Management fees being paid to all management services organizations are currently under consideration by Bureau of Health Insurance policy groups. Any resultant guidelines or directives could affect all management fees; therefore, the entire amount of management fees is subject to revision during the 3-year period following the date of this Revised Notice of Amount of Medicare Program Reimbursement if such revision is required by Health Insurance policy.

Thereafter, the Intermediary reopened its review of Home Health's cost report for 1975 and on or about January 17, 1977, the director of the Intermediary informed Home Health that the 1975 cost report would be adjusted downward in the amount of $16,126. This amount represented an $11,976 adjustment of the Unihealth man-

agement services fees, a $1,150 adjustment of the amortized Unihealth start-up cost, and a $3,000 adjustment of local CPA service fees which were found to be duplicative of services provided by Unihealth. The Intermediary's letter to Home Health stated that "this amount ($16,126) represents a partial disallowance of fees charged by Unihealth as an unreasonable cost." In an accompanying adjustment report, the explanation for the adjustment was stated as "To adjust service fees in accordance with reasonable cost and prudent buyer concept" as set forth in HIM–15. (Healthcare Intermediary Manual) sections 2102.1 and 2103. Also accompanying the letter was the following breakdown of the costs claimed by Home Health for the services provided by Unihealth and the costs allowed by the Intermediary.

HOME HEALTH SERVICES OF GREATER
PHILADELPHIA, INC.

Total Allowable Cost for the Period
July 1, 1974 – June 30, 1975

| | As Claimed | Corrected | |
|---|---|---|---|
| Start-up cost | $12,500 | $ 6,750 | |
| Amortized over 60 months | 2,500 | 1,350 | |
| Disallowance | | | $1,150* |
| EDP Fee | | $12,345 | |
| Consulting | | 3,360 | |
| Travel | | 963 | |
| Accounting Fees | | 3,700 | |
| | $32,344 | $20,368 | |
| Plus: Services of Local CPA (a duplication of function) | 3,000 | | |
| | $35,344 | $20,368 | |
| Disallowance | | $14,976 | |
| | $35,344 | $35,344 | |
| Total Disallowed Fees | . | | $14,976 |
| | | | $16,126 |

On April 10, 1978, Home Health appealed these adjustments to the PRRB pursuant to section 1878 of the Social Security Act, 42

\* The above fees were costed out under Sections 2102.1, 2103, and 2133 of HIM–15. [footnote in the original].

U.S.C. 1395 oo. The Board held a hearing on January 18, 19, 25, and 26, 1979 and issued a decision on May 16, 1979 in which it reversed the Intermediary's adjustments and held: ". . . the management fees paid by the Provider [Home Health] under the service contract with Unihealth Services Corporation are reasonable and necessary Medicare cost." In its opinion, the PRRB stated, "Therefore, the Board does not accept the Intermediary's position that the Provider's management fees are substantially out of line compared with other institutions in the same geographic area which are similar in size, scope of service, utilization and relevant factors as defined in § 405.451(c)(2)."

Pursuant to 42 U.S.C. § 1395 oo(f)(1), the Secretary, through the Administrator of the Department's Health Care Financing Administration (Administrator), reviewed the Board's decision and on July 15, 1979, the Administrator issued an opinion reversing the Board and holding: "The management and accounting fees paid by the Provider exceeded reasonable and necessary Medicare costs, and are limited to the amounts not in excess of those allowed in the Notice of Program Reimbursement · issued by the Intermediary on January 17, 1978." The administrator's decision contained the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. The amount of Medicare reimbursement in dispute for the 1975 cost year under appeal exceeds $10,000.

2. Unihealth Services Corporation is a Louisiana based, for-profit corporation formed in 1969, which establishes Medicare home health agencies and then furnishes continuing management services.

3. On July 7, 1971, Unihealth contracted with Bernard Shaper, now the Provider's Executive Director, to assist him in establishing a home health agency, which would qualify for Medicare participation.

4. The contract also called for furnishing continuing management services by Unihealth to the Provider for a term of 35 years.

5. The contract required the Provider to pay Unihealth $12,500 upon execution, for starting up the Provider. It also called for payment of the greater of a flat monthly amount, or 7 percent of its gross monthly billings, for continuing management services.

6. On August 2, 1973, the Provider was certified for participation in the Medicare program as a non-profit, home health agency.

7. The periodic reimbursement for continuing management services, based on the Provider's gross monthly billings, bore no statistical relationship to the actual services rendered or to be rendered by Unihealth.

8. The Provider amortized the $12,500 "starting up" fee over a 5 year period, for claiming Medicare reimbursement purposes.

9. For the cost year ending June 30, 1975, the Provider serviced only Medicare beneficiaries.

10. For the cost year ending June 30, 1975, the Provider claimed Medicare reimbursement for $37,844 in management fees, consisting of $2,500 of amortized start up costs, $32,344 of current period management fees, and $3,000 for accounting fees.

11. The Provider reported these items on its cost report for the cost year under appeal, as a lump sum, with no breakdown of the services or costs comprising the management fee.

12. On January 5, 1977, the Intermediary requested the Provider to furnish a breakdown of the fees paid to Unihealth with a value placed on each service rendered.

13. On March 25, 1977, Unihealth responded that such a breakdown was not available because it did not bill for specific services rendered.

14. In response to the Intermediary's further requests, Unihealth subsequently submitted a breakdown based on estimates.

15. Based on this information, the Intermediary determined what it considered the reasonable management fee by comparison with the cost of obtaining the individual services elsewhere.

## CONCLUSIONS OF LAW

1. The Provider's payment of management fees in excess of the amounts determined to be allowable by the Intermediary was not a reasonable cost of services related to the care of Medicare beneficiaries within the principle and definition of 42 CFR 405.451(a), (b)(1), and (b)(2).

2. The management fees claimed in the Provider's cost report for the cost year ending June 30, 1975, in excess of those allowed by the Intermediary, are costs unnecessary in the efficient delivery of needed health services, and may not be reimbursed as reasonable costs under the Medicare program, under Sections 1814(b) and 1861(v)(1)(A) of the Social Security Act, as amended [42 U.S.C. §§ 1395(f) and 1395(x) ].

3. The Provider has not furnished sufficient financial records and statistical data to assure proper determination of its costs, as required under Section 1815(a) of the Social Security Act, as amended [42 U.S.C. § 1395(g) ], and 42 CFR 405.406(a), (d)(1), and (d)(2).

4. The fees paid for the services rendered by Unihealth were shown to be substantially out of line with such costs incurred by other comparable Providers for comparable services, under 42 CFR 405.451(c)(2).

5. Reimbursement was properly denied by the Intermediary, for the excess management fees, under Sections 1815(a) and 1861(v)(1)(A) of the Social Security Act, as amended [42 U.S.C. § 1395(g) and 1395(x) ], and 42 CFR 405.406(e).

## DECISION

The decision of the Provider Reimbursement Review Board is reversed. The

management and accounting fees paid by the Provider exceeded reasonable and necessary Medicare costs, and are limited to the amounts not in excess of those allowed in the Notice of Program Reimbursement issued by the Intermediary on January 17, 1978.

The Administrator's decision constituted the final administrative decision of the Secretary of HEW. This appeal followed pursuant to section 1878(f)(1) of the Social Security Act, 42 U.S.C. § 1395 oo(f)(1).

### III. *Scope of Review*

The scope of our review of the final decision of the Secretary in this case is a limited one. Unless shown to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or unsupported by substantial evidence, the Secretary's determination should stand. 42 U.S.C. 1395 oo(f)(1); 5 U.S.C. § 706(2)(A), (E); *Saint Luke's Hospital of Bethlehem, Pa. v. Schweiker*, No. 80–1710 (E.D.Pa., August 12, 1981); *Fallstown General Hospital v. Harris*, 481 F.Supp. 1066, 1067 (D.Md.1979); *St. Francis Hospital v. Califano*, 479 F.Supp. 761, 763 (D.D.C.1979); *Fairfax Hospital Association, Inc. v. Mathews*, 459 F.Supp. 429, 431 (E.D.Va.1977) *affirmed*, 585 F.2d 602 (4th Cir. 1978); *see Gosman v. United States*, 573 F.2d 31, 34 (Ct.Cl.1978).

As Chief Judge Peckham stated in *John Muir Memorial Hospital, Inc. v. Harris*, No. 79–2686 FRP, (N.D.Ca. June 25, 1980)

"Substantial evidence" means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 [59 S.Ct. 206, 83 L.Ed. 126] (1938). The fact that inconsistent conclusions could be drawn from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. *Good Samaritan Hospital v. Mathews*, 609 F.2d 949 (9th Cir. 1979); *NLRB v. Nevada Consolidated Copper Corp.*, 319 U.S. 105, 106 [62 S.Ct. 960, 86 L.Ed. 1305] (1942). The Secretary's decision may not be nullified by a reviewing court simply because the court might have reached a different conclusion

had the matter be[en] before it *de novo. NLRB v. Minnesota Mining & Mfg. Co.*, 179 F.2d 323 (8th Cir. 1950). We are not to decide whether the Secretary made the "right decision but only whether the Secretary made a supportable decision. *Widing, Inc. v. ICC*, 545 F.2d 652, 661 (9th Cir. 1976); *see also Good Samaritan supra* at 951.

Nevertheless, in determining whether there is substantial evidence to support the Secretary's decision, the reviewing court must make a searching inquiry of the record and may not simply "bow to the mysteries of administrative expertise" by acting as a "rubber stamp" for agency action. *See Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 597 (D.C.Cir.1971); *AMI–Chano [Chanco] Inc. v. United States*, 576 F.2d 320, 326 (Ct.Cl.1978).

In determining whether the Administrator's decision meets the above standards, the Administrator's findings must be considered in light of the whole record before the agency at the time the decision was made without consideration for post hoc rationalizations. *Saint Luke's Hospital of Bethlehem, Pa. v. Schweiker*, No. 80–1710 at p. 8 (E.D.Pa. August 12, 1981); *Beverly Enterprises v. Califano*, 446 F.Supp. 599, 607 (D.D.C.1978).

Plaintiff argues that the Secretary's reversal of the PRRB decision should be overturned by this Court unless it appears that the PRRB decision was not supported by substantial evidence. Section 1395 oo of Title 42 does not, however, place such a limitation on the Secretary's review. As the fifth circuit has stated, under 42 U.S.C. § 1395 oo and section 557 of Title 5, "the decision of the PRRB carries no more weight on review by the Secretary than any other interim decision made along the way in an agency where the ultimate decision of the agency is controlling." *Homan & Crimen, Inc. v. Harris*, 626 F.2d 1201, 1205 (5th Cir. 1980), *rehearing denied*, 5 Cir., 633 F.2d 582. Likewise, the fourth circuit has stated that the Secretary's right of review of Medicare Provider Reimbursement Review

Board decisions is not limited to review merely for substantial evidence. *Fairfax Hospital Association v. Califano*, 585 F.2d 602, 612 (4th Cir. 1978). We agree and have reviewed the entire administrative record in order to determine whether the Administrator's decision is arbitrary, capricious, an abuse of discretion, not in accordance with law or unsupported by substantial evidence.

In light of the above, the only issue for this Court to determine is whether the Administrator's findings of fact and conclusions of law that the Unihealth fees which were disallowed were unreasonable and unnecessary costs and that Home Health failed to provide sufficient documentation are arbitrary, capricious, an abuse of discretion, not in accordance with law or unsupported by substantial evidence upon reviewing the whole record.

### IV. *Discussion*

With respect to the question of sufficient documentation, the Administrator issued the following two conclusions of law:

3. The Provider has not furnished sufficient financial records and statistical data to assure proper determination of its costs, as required under Section 1815(a) of the Social Security Act, as amended [42 U.S.C. § 1395(g) ], and 42 CFR 405.406(a), (d)(1), and (d)(2).

5. Reimbursement was properly denied by the Intermediary, for the excess management fees, under Sections 1815(a) ... of the Social Security Act, as amended [42 U.S.C. § 1395(g) ...], and 42 CFR 405.406(e).

Section 1815(a) of the Social Security Act, as amended, 42 U.S.C. 1395g(a), provides in pertinent part.

... no such payments [to providers] shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider under this part for the period with respect to which the amounts are being paid for any prior period. .

42 C.F.R. 405.406(a)(1), (d)(1) and (2), and (e) set forth the recordkeeping requirements for providers:

"(a) *General.* The principles of cost reimbursement will require that providers maintain sufficient financial records and statistical data for proper determination of costs payable under the program. Standardized definitions, accounting, statistics, and reporting practices which are widely accepted in the hospital and related fields are followed. Changes in these practices and systems will not be required in order to determine costs payable under the principles of reimbursement. Essentially the methods of determining costs payable under title XVIII involve making use of data available from the institution's basic accounts, as usually maintained, to arrive at equitable and proper payment for services to beneficiaries.

"(d) *Continuing provider recordkeeping requirements.*(1) The provider shall furnish such information to the intermediary as may be necessary (i) to assure proper payment by the program, including the extent to which there is any common ownership or control (see § 405.427(b)(3) and (3)) between providers or other organizations, and as may be needed to identify the parties responsible for submitting program cost reports, (ii) to receive program payments, and (iii) to satisfy program overpayment determinations.

"(2) The provider shall permit the intermediary to examine such records and documents as are necessary to ascertain information pertinent to the determination of the proper amount of program payments due. These records shall include, but not be limited to, matters of provider ownership, organization, and operation; fiscal, medical, and other recordkeeping systems; Federal income tax status; asset acquisition, lease, sale or other action; franchise or management arrangements; patient service charge schedules; matters pertaining to costs of operation; amounts of income received by source and purpose; and flow of funds and working capital.

"(e) *Suspension of program payments to a provider.* When an intermediary determines that a provider does not maintain

or no longer maintains adequate records for the determination of reasonable cost under the health insurance program, payments to such provider shall be suspended until the intermediary is assured that adequate records are maintained. Before suspending payments to a provider, the intermediary shall, in accordance with the provisions of § 405.371(a), send written notice to such provider of its intent to suspend payments. The notice shall explain the basis for the intermediary's determination with respect to the provider's records and shall identify the provider's recordkeeping deficiencies. The provider will be given the opportunity, in accordance with § 405.371(a) to submit a statement (including any pertinent evidence) as to why the suspension should not be put into effect."

 The Administrator's findings of fact provide little aid in determining the factual basis for the Administrator's conclusion that Home Health violated the above provisions. The Administrator found only that: Home Health submitted a cost report with a single cost figure for management fees; the intermediary subsequently requested a breakdown of the management fees with a breakdown showing each service rendered and the cost allotted to each service; Home Health was unable to provide such a breakdown because it was not billed for specific services; and, Unihealth responded with a breakdown based on estimates. Such evidence is not substantially sufficient to support the Administrator's conclusion that Home Health violated the above recordkeeping provisions. Indeed, the administrative record supports the contrary conclusion. The testimony of the witnesses who appeared at the PRRB hearing shows that both Home Health and Unihealth cooperated in the Intermediary's review of costs by providing virtually all their records. However, due to the fact that the service contract provided for payment based on a percentage of Home Health's gross billings, Home Health did not have records which broke down the management fee payments on the basis of each service rendered by Unihealth and there were no regulations in force at that time requiring Home Health to maintain such records, nor were there any regulations prohibiting the use of percentage fee arrangements for obtaining management services. The regulation appearing at 42 C.F.R. § 405.406(a) states that "Standardized definitions, accounting, statistics, and reporting practices which are widely accepted in the hospital and related fields are followed." There is nothing in the record indicating that Home Health failed to employ such standard practices. In light of the terms of its contract with Unihealth, it was unnecessary to attempt to maintain detailed records of the days and hours Unihealth expended in rendering its services. As a matter of fact, it would have been a practical impossibility for Home Health to maintain records concerning the time expended by Unihealth in providing its "package" of services. Furthermore, in light of the fact that the Intermediary was able to determine the reasonableness of the management fees paid by Home Health to Unihealth in 1974 without the use of such records, there was no reason for Home Health to attempt to keep the type of records contemplated in the Administrator's decision.

Lastly, we note that § 405.406(e), a provision heavily relied upon in the Administrator's decision, is inapplicable to the instant case on the basis of the Administrative records. § 405.406(e) provides for the suspension of payments to a provider where the provider does not maintain adequate records for the determination of reasonable cost under the program. This regulation provides that a written notice of an intent to suspend payment must be sent to the provider and the written notice must identify the provider's recordkeeping deficiencies. The administrative record reveals that no such written notice was sent to Home Health, no suspension was effected or threatened, and no written notice identifying a specific recordkeeping deficiency was sent to Home Health. Therefore, the Court has determined that the Administrator's conclusion of law that Home Health failed to maintain records in accordance with 42

U.S.C. 1395g and 42 C.F.R. 405.406(a), (d)(1) and (2), and (e) is unsupported by substantial evidence in this record.

With respect to the question of the reasonableness of the Unihealth management fees, the Administrator made the following conclusions of law:

1. The Provider's payment of management fees in excess of the amounts determined to be allowable by the Intermediary was not a reasonable cost of services related to the care of Medicare beneficiaries within the principle and definition of 42 CFR 405.451(a), (b)(1), and (b)(2).

2. The management fees claimed in the Provider's cost report for the cost year ending June 30, 1975, in excess of those allowed by the Intermediary, are costs unnecessary in the efficient delivery of needed health services, and may not be reimbursed as reasonable costs under the Medicare program, under Sections 1814(b) and 1861(v)(1)(A) of the Social Security Act, as amended [42 U.S.C. § 1395(f) and § 1395(x)].

4. The fees paid for the services rendered by Unihealth were shown to be substantially out of line with such costs incurred by other comparable Providers for comparable services, under 42 CFR 405.451(c)(2).

5. Reimbursement was properly denied by the Intermediary, for the excess management fees, under Sections . . . 1861(v)(1)(A) of the Social Security Act, as amended [42 U.S.C. . . . 1395(x)] . . .

As set forth in the Administrator's opinion, these determinations were made pursuant to the following statutory provisions and regulations:

42 U.S.C. 1395f which provides,

(b) The amount paid to any provider of services with respect to services for which payment may be made under this part shall, subject to the provisions of section 1813, [1395e] be—

(1) the lesser of (A) the reasonable cost of such services, as determined under section 1861(v), [1395x] or (B) the customary charges with respect to such services;
. . .

42 U.S.C. 1395x(v)(1)(A), which defines reasonable costs and sets forth the guidelines for regulations, provides,

"(v)(1)(A) The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services; except that in any case to which paragraph (2) or (3) applies, the amount of the payment determined under such paragraph with respect to the services involved shall be considered the reasonable cost of such services. In prescribing the regulations referred to in the preceding sentence, the Secretary shall consider, among other things, the principles generally applied by national organizations or established prepayment organizations (which have developed such principles) in computing the amount of payment, to be made by persons other than the recipients of services, to providers of services on account of services furnished to such recipients by such providers. Such regulations may provide for determination of the costs of services on a per diem, per unit, per capita, or other basis, may provide for using different methods in different circumstances, may provide for the use of estimates of costs of particular items or services, . . . and may provide for the use of charges or a percentage of charges where this method reasonably reflects the costs. Such regulations shall (i) take into account both direct and indirect costs of providers of services (excluding therefrom any such costs, including standby costs, which are determined in accordance with regulations to be unnecessary in the efficient delivery of services covered by the insurance programs established under this title) in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered

services to individuals covered by the insurance programs established by this title will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs, and (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive."

42 CFR 451(a), (b)(1), (b)(2) and (c)(2) further elaborate the principles and criterion for provider reimbursement as follows,

"(a) *Principle.* All payments to providers of services must be based on the reasonable cost of services covered under title XVIII of the Act and related to the care of beneficiaries. Reasonable cost includes all necessary and proper costs incurred in rendering the services, subject to principles relating to specific items of revenue and cost. However, for cost reporting periods beginning after December 31, 1973, payments to providers of services are based on the lesser of the reasonable cost of services covered under title XVIII of the Act and furnished to program beneficiaries or the customary charges to the general public for such services, as provided for in § 405.455. "(b) *Definitions*—(1) *Reasonable Cost.* Reasonable cost of any services must be determined in accordance with regulations establishing the method or methods to be used, and the items to be included. The regulations in this subpart take into account both direct and indirect costs of providers of services. The objective is that under the methods of determining costs, the costs with respect to individuals covered by the program will not be borne by individuals not so covered by the program. These regulations also provide for the making of suitable retroactive adjustments after the provider has submitted fiscal and statistical reports. The retroactive adjustment will represent the difference between the amount received by the provider during the year for covered

services from both title XVIII and the beneficiaries and the amount determined in accordance with an accepted method of cost apportionment to be the actual cost of services rendered to beneficiaries during the year."

"(2) *Necessary and proper costs.* Necessary and proper costs are costs which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs which are common and accepted occurrences in the field of the provider's activity."

. . . .

"(c)(2) The costs of providers' services vary from one provider to another and the variations generally reflect differences in scope of services and intensity of care. The provision in title XVIII of the Act for payment of reasonable cost of services is intended to meet the actual costs, however widely they may vary from one institution to another. This is subject to a limitation where a particular institution's costs are found to be substantially out of line with other institutions in the same area which are similar in size, scope of services, utilization, and other relevant factors."

[2] The factual basis for the Administrator's determination that the management fees paid by Home Health were unreasonable is obscure, if not non-existent. Virtually the only finding of fact made by the Administrator with respect to the question of the reasonableness of the Unihealth fees is: "Based on this information, [Unihealth's breakdown of services based on estimates] the Intermediary determined what it considered the reasonable management fee by comparison with the cost of obtaining the individual services elsewhere." The Administrator then concludes that any fees paid by Home Health in excess of the Intermediary's determinations were unreasonable and unnecessary costs. The Administrator accepts the determination of the Intermediary without making any specific factual findings to support his conclusion. In the sections of his opinion entitled "Evi-

dence Considered" and "Discussion and Evaluation" the Administrator does little more than reproduce the figures and adjustments made by the Intermediary without any analysis of the evidence supporting the adjustments. The Court, therefore, has made an exhaustive review of the entire administrative record, consisting of approximately 2,000 pages, in order to determine whether the record contains substantial evidence to support the Administrator's determination that the disallowed management fees were unreasonable. Based on this review, the Court has determined that the Intermediary's adjustments and the Administrator's finding that the disallowed Unihealth fees were unreasonable and unnecessary costs are not supported by substantial evidence.

Our review of the adjustments approved by the Administrator show that these adjustments occurred in three areas: (1) the start-up cost of $12,500 charged by Unihealth was reduced to $6,750, resulting in an adjustment of the amortized start-up cost of $2,500 for 1975 to $1,350; (2) the management fees for EDP [Electronic Data Processing], consulting, travel and accounting services rendered by Unihealth were reduced from $32,344 to $20,368; and, (3) a $3,000 fee paid to a local CPA was disallowed in its entirety as "a duplication of function."

*Start-Up Fees*

The record shows that the adjustment of the start-up fees charged by Unihealth was basically a subjective and arbitrary determination. For instance, the testimony before the PRRB of Mr. Joseph Brewster, the staff accountant for the Intermediary who made the adjustments with respect to the start-up costs charged by Unihealth, shows that he frequently disallowed in part or in total the hourly charges submitted by Unihealth for various start-up costs such as drafting by-laws, name searches, and the registration of Home Health's corporate name based upon his own subjective determination that it should not have taken Unihealth the reported amount of time to perform these functions. Thus, he reduced the

two hours reportedly spent researching and reserving Home Health's corporate name to zero. Again, four hours reported in obtaining the necessary IRS exemption as a nonprofit organization were reduced to zero, and 16 hours reported for preparing manuals for Home Health were reduced to zero. Mr. Brewster himself admitted that a number of these determinations were based on his own subjective feelings that a certain charge or number of hours reported did not seem reasonable. In addition, Mr. Brewster testified and indicated that he was extremely aware of the fact that the figures he was given were estimates. He apparently assumed that there was no reason to attach any credibility to the reported figures because they were estimates.

This type of subjective adjustment, where an all or nothing approach is taken in disallowing various costs and time charges, is inconsistent with the language of 42 CFR 405.451(c)(2) recognizing that "the costs of provider's services vary from one provider to another and the variations generally reflect differences in scope of services and intensity of care.... payment of reasonable cost of services is intended *to meet the actual costs, however widely they may vary from one institution to another. This is subject to a limitation where a particular institution's costs are found to be substantially out of line with other institutions in the same area which are similar in size, scope of services, utilization, and other relevant factors."* (emphasis added).

The record is devoid of any evidence that Unihealth's start-up cost was substantially out of line with the start-up cost paid by comparable providers in the area. Indeed, the only testimony relating to the start-up costs paid by a provider other than Home Health was that a start-up fee of $15,000 paid by one provider had been found reasonable, whereas Home Health had only been charged $12,500. As Mr. Brewster testified:

 Q. Okay. Does National Health Service Delivery Systems and Medipatients of America do primarily the same thing that Unihealth does?

A. I believe they do.

Q. Did you check to see what they were charging for similar services as Unihealth for the fiscal year 1975?

A. I was verbally told, and I had inspected on[e] of their contracts.

Q. What where they charging?

A. I believe around $40 to $50 dollars an hour.

Q. And, insofar as the initial set of contracts, what were they charging the start up of Home Health Agencies with basic services as included in the evaluation one through five?

A. Now, I don't know what their standard fee is, but I had seen one particular contract with one Home Health Agency and I believe it was around $15,-000 dollars.

Q. Turn to page two if you will, the next page after purpose indicated therein. The next page, number two at the top, and there is a conclusion of the evaluation of the services and the reasonable rate per hour.

Is there an indication therein that this survey indicated that a rate of $50 dollars per hour inclusive of expenses is reasonable, and then in the next paragraph it says in both cases no actual time records are kept. Did you understand this to be kind of the way the industry like Unihealth is run.

In other words the consultant services there are little or no actual time records being kept?

A. Again, you are asking me a question of, and I am not aware of it. The basic review I had was of Unihealth. The Medipatients and National In Home, whatever, Delivery System, the other management service, was not reviewed in any depth if there were any records kept.

I know for a fact that start up costs, the one case of $15,000 dollars did include quite voluminous records, maybe 10 to 15 different pages of dates, times, purposes, of meetings as documentation.

But, on an ongoing basis I am not sure whether they did keep records or did not keep records.

Q. Well, the last line reads, "based on general estimates of time taken to perform the whole start up process, the fee of $15,000 dollars is considered reasonable."

Did you utilize that $15,000 dollar finding of reasonable cost in connection with the work papers that you did and the conclusion as it appears with respect to Home Health of Greater Philadelphia in the January 17, 1978 notice of program reimbursement?

A. No, I did not.

In light of the admittedly subjective nature of the adjustment to Unihealth's start-up fee and the lack of any evidence that the fee was substantially out of line with the start-up costs of other comparable providers, this Court has determined that the Administrator's finding that the fees charged by Unihealth were unreasonable and unnecessary insofar as it relates to the start-up costs, is not supported by substantial evidence. .

*Management Fees*

Relying on 42 C.F.R. 405.451(c), the Administrator found the "fees paid for· services rendered by Unihealth were shown to be substantially out of line with costs incurred by other comparable providers for comparable services." We find no evidential support for this finding in the record. The record is devoid of any reference to the costs incurred by a single *provider* "in the same area," and "similar in size, scope of services, utilization, and other relevant factors" as required by 42 C.F.R. 405.451(c)(2). While the record contains evidence that the intermediary attempted to collect estimates of what it would cost to obtain the various services provided by Unihealth from outside sources, there was no evidence that the various service corporations providing the estimates serviced providers in or around the Philadelphia area or that these estimates represented the prices comparable providers in the Philadelphia area were paying in 1975. For example, the Intermediary used the cost figure supplied by Diversified Computer Applications (DCA), a service company located in California, as

the basis for the reasonable cost of the data processing services provided by Unihealth, yet no one knew whether they serviced providers in the Philadelphia area. Furthermore, the DCA figure was used by the Intermediary as a "benchmark" or fixed criterion for reasonable cost because the DCA service charge fell in the middle of the range of fees charged by other data processing firms. This arbitrary declaration of "reasonable cost" is contrary to the flexibility of the concept of reasonable cost inherent in 42 C.F.R. 405.451(c)(2). The mere fact that someone charges a higher fee than DCA does not mean that such a fee is unreasonable. In addition, the record shows that Mr. Wasserman, one of the staff accountants for the Intermediary who testified regarding the estimates used in making the cost adjustments, had not himself contacted the companies supplying the estimates. The record shows that he had no contact whatsoever with the firms supplying the estimates and little knowledge of the comparability of services provided by the firms and those supplied by Unihealth. Thus, viewing the record as a whole, the Court has determined that the Administrator's conclusion that the management fees charged by Unihealth were substantially out of line with other providers in the same area is not supported by substantial evidence. In fact, the record reflects that the cost per visit for management fees supplied by Unihealth went down from $1.77 in 1974, a year in which Unihealth's management fees were found reasonable, to $1.49 in 1975, the year they were found unreasonable. Furthermore, the record shows that the testimony of Bernard Shaper, the executive director of Home Health, that Home Health's total cost per visit was lower than the cost per visit of other providers, was never contradicted.

*Accountant Fees*

Home Health's claim for $3,000 for the services of a local accountant was disallowed as unreasonable and unnecessary. This disallowance was apparently based upon the testimony of Mr. Brewster, the accountant who disallowed the fee, that in a conversation with Mr. Shaper, the executive director of Home Health, Mr. Shaper told

him that the CPA was used to "check up" on the services being performed by Unihealth. On the basis of this statement, Mr. Brewster concluded that the CPA's services were a "duplication of function." Mr. Shaper testified that the CPA never duplicated any of the work performed by Unihealth and that the Unihealth agreement did not provide the type of service performed by the local CPA. There is no substantial evidence in the administrative record which supports a finding that the use of the local CPA for the purposes as testified to by Mr. Shaper amounted to an unreasonable or unnecessary cost. There is no question that the CPA rendered a service or that the service was necessary. There is also no question that there was never any actual duplication of work. We therefore determine that there is no substantial evidence to support the finding that the $3,000 fee paid to the CPA was unreasonable or unnecessary.

The Court therefore determines that the Administrator's decision which reversed the decision of the PRRB and which finds that the management and accounting fees paid by Home Health exceeded reasonable and necessary Medicare costs and that Home Health failed to maintain sufficient records in accordance with 42 C.F.R. § 405.406(a), (d)(1), (d)(2) and (e) and 42 U.S.C. § 1395g is not supported by substantial evidence.

On the other hand, this Court having thoroughly reviewed the administrative record and the decision of the PRRB, concluded that the PRRB's decision, finding the start-up costs, management fees, and the accounting fee paid by Home Health were reasonable and necessary Medicare costs is supported by substantial evidence. The testimony of the witnesses appearing before the PRRB and the accompanying exhibits provide substantial evidence that Home Health received a vast array of services from Unihealth, that these services, as well as the services of the local CPA, were necessary, and that the cost paid by the Home Health for these services was reasonable.

Therefore, the Court, having determined upon a review of the entire administrative record that the decision of the Administrator is not supported by substantial evidence

and that the decision of the PRRB is supported by substantial evidence, will grant summary judgment in favor of the plaintiff, Home Health Services of Greater Philadelphia, Inc. and against the defendant Patricia Roberts Harris and will enter an order vacating the decision of the Administrator and reinstating the decision of the PRRB.

In view of the Court's determination that the decision of the Administrator be vacated and the decision of the PRRB be reinstated for the reasons hereinabove set forth, the Court declines to consider the alleged constitutional questions raised by the plaintiff on the basis of the admonition of the Supreme Court in *Hagans v. Lavine*, 415 U.S. 528, 548, 94 S.Ct. 1372, 1385, 39 L.Ed.2d 577 (1973), that "a federal court should not decide federal constitutional questions where a dispositive nonconstitutional ground is available."